**STATE of Iowa, Appellee,**

v.

**Mary Kathleen COLE, Appellant.**

No. 62552.

Supreme Court of Iowa.

July 16, 1980.

Lawrence F. Scalise, John R. Sandre, and Ann Fitzgibbons, of Scalise, Scism, Gentry, Brick & Brick, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Julie F. Pottorff, Asst. Atty. Gen., David J. Dutton, County Atty., and Ruth R. Harkin, Sp. Asst. Polk County Atty., for appellee.

LARSON, Justice.

This defendant appeals her conviction, in a jury-waived trial, of first-degree murder in violation of section 690.2, The Code 1977. She challenges the trial court's rulings in regard to (1) psychiatric evidence secured by depositions and in-trial testimony, (2) admission of objects sized from the defendant's automobile and (3) ordering a deposition of defendant's husband. We affirm the trial court.

It is undisputed that on September 15, 1977, the defendant shot and killed Dr. Alan Tyler, her ex-husband, in his office at Wilden Clinic. Immediately after the shooting, she proceeded to the reception area and announced that she had "shot her husband." She then called the police and waited for them at the clinic. She was brought before a magistrate for an initial appearance where she was represented by Lawrence Scalise and Thomas Levis. At that time an order was signed by the magistrate to take the defendant to Iowa Lutheran Hospital "to undergo psychiatric and physical examination and evaluation." It is this order and the related evidence concerning the mental condition of the defendant which give rise to the most troublesome issues.

I. *The psychiatric evidence.*

A. *Effect of the commitment order.* Pursuant to the court's order, the defendant was first examined by Dr. Michael Taylor, a psychiatrist who had been treating her on a private basis since before the shooting. He ceased his examination of her on September 30, 1977, at which time he was replaced by Dr. Vernon Varner. The defendant filed notice, pursuant to Iowa R.Crim.P. 10(10)(b)(1), that she intended to rely upon the defense of diminished capacity. The State then sought to obtain psychiatric evidence through these doctors' depositions and in-trial testimony.

Upon application of the State, and over defendant's objections, pretrial depositions of Doctors Taylor and Varner were ordered by the court. Dr. Varner complied, and his deposition was taken. Dr. Taylor failed to appear for examination by the county attor-

ney, and apparently no pretrial statement was ever taken from him. Again over objection, the trial court permitted Dr. Taylor to testify at trial in the State's case in chief.

Defendant argues the trial court's rulings on the admissibility of the psychiatric evidence was erroneous because they violated her doctor-patient privilege, set out in section 622.10, The Code, as follows:

> No practicing attorney, counselor, physician, surgeon, or the stenographer or confidential clerk of any such person, who obtains such information by reason of his employment, minister of the gospel or priest of any denomination shall be allowed, in giving testimony, to disclose any confidential communication properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline. Such prohibition shall not apply to cases where the person in whose favor the same is made waives the rights conferred. . . .

As the following authorities established, not every doctor-patient relationship provides a basis for exclusion of the doctor's testimony. In some cases the privilege never arises; in others it exists but is held to be waived by the patient. The privilege did not exist at common law, 3 Wharton's Criminal Evidence § 563, at 86 (Torcia ed. 1973); 8 J. Wigmore, Evidence in Trials at Common Law § 2380, at 818–20 (privilege "has come to mean little but the suppression of useful truth") (McNaughton rev. 1961), and its embodiment by statute has been criticized by at least one writer. *Id.* § 2380(a), at 828–32. While our cases have evidenced no hostility to the rule itself, they have uniformly required three elements to be established: (1) the relationship of doctor-patient; (2) acquisition of the information or knowledge during this relationship; and (3) the necessity of the information to enable the doctor to *treat* the patient skillfully. *See State v. Nowlin*, 244 N.W.2d 596, 602 (Iowa 1976); *State v. District Court of Linn County*, 218 N.W.2d 641, 643 (Iowa 1974); *State v. Bedel*, 193 N.W.2d 121, 124 (Iowa 1971).

The order signed by the magistrate was as follows:

## ORDER FOR PSYCHIATRIC EVALUATION AND REPORT

NOW, on this 15th day of September, 1977, this matter having been brought to the attention of the court, and the court being fully advised of the charges against the defendant in the above captioned cause, and the present condition of the defendant; it is the considered opinion of this court that before further proceedings may be had an evaluation of the above-named defendant's physical and psychological state should be made by competent professionals in the fields of medicine and psychology in order that the court may be more fully advised and that the best interests of the parties and of justice may be realized.

IT IS ORDERED, ADJUDGED AND DECREED that the above-named defendant, now in legal custody, be transported to 2 East, North Ward, Iowa Lutheran Hospital, there to undergo psychiatric and physical examination and evaluation by such doctors and staff of said hospital as may be appointed by the director of the Psychiatric Unit of said hospital and Dr. Michael Taylor and FURTHER, that a report of such examinations and evaluations, along with any conclusions of the examining physicians shall be made in writing to this court as soon as completed, at Defendant's expense with guard only if necessary.

IT IS FURTHER ORDERED that the defendant at all times pertinent hereto is to remain under the custody of this court and that upon completion of said evaluations and examinations by the Psychiatric Unit of Lutheran Hospital the defendant shall be transported back to the immediate custody of the agency formerly charged with his or her custody and that this court shall be so notified in order that it may proceed with such further action as the laws of this state and the interests of justice might dictate.

Later, when it appeared that Cole could not be admitted immediately to Iowa Lutheran, the following was added to the order: "The defendant to be taken to Broadlawns [hospital] until a room at Lutheran Hospital is available."

■ The effect of this order, and of the medical relationship which followed it, are determinative on the issue of whether or not the defendant could assert the doctor-patient privilege. In court-ordered evaluations, the third requirement of the privilege is lacking; the communication is not for the purpose of treatment but to determine the existence of a fact or condition for the benefit of the court. *See State v. District Court of Linn County*, 218 N.W.2d at 643; *State v. Bedel*, 193 N.W.2d 121, 124 (Iowa 1971); *State v. Mayhew*, 170 N.W.2d 608, 615–16 (Iowa 1969). Therefore, "[t]he physician-patient privilege does not arise where on order of the court a defendant is examined to determine his mental or physical condition." *Mayhew*, 170 N.W.2d at 615. *Accord,* McCormick's Handbook of the Law of Evidence § 99, at 214 (2d ed. 1972).[1]

An examination of the order itself sheds considerable light on the subsequent relationship of Cole with Doctors Taylor and Varner. The order is entitled "Order for Psychiatric *Evaluation and Report*," and in the body of the order it provides that "before further proceedings may be had an *evaluation of the above-named defendant's physical and psychological state should be made* . . . in order that the court may be more fully advised and that the best interests of the parties and of justice may be realized." (Emphasis added.) The order clearly provided for evaluation and report to the court and made no provision for diagnosis or treatment.

■ The defendant, while acknowledging that the order appears to be for evaluation and report, argues it was really only intended to provide for her safekeeping in order to avoid a possible suicide. We do not believe the intentions of the parties can be properly used to countermand the unambiguous provisions of a court order. 9 J. Wigmore, *supra,* § 2450, at 157; ("[T]he [judicial] record being the sole embodiment of the judicial proceedings, no other materials or utterances, oral or written, can be set up in competition with it. In other words, but less correctly, the record is *conclusive*.") (Emphasis in original.).[2] *Cf. State v. Rouse*, 290 N.W.2d 911, 916 (Iowa 1980) (impeachment of jury verdict proscribed by parol evidence rule). Nevertheless, we have examined the evidence which defendant says establishes that the order was for treatment and not for evaluation.

At a hearing on the issuance of a subpoena to force Dr. Taylor to submit to a deposition, the magistrate who signed the order, an assistant county attorney, and defense attorneys all testified about the circumstances surrounding the entry of the order. Mr. Scalise testified that the reason for entering the order for hospitalization was to avoid a possible suicide by Cole if she went to jail and that the "examination and evaluation" provisions were in the order only because they were incorporated in a form order that "we got out of somebody's desk." He testified "[t]here was never any discussion or mention of the word evaluation, that's my recollection of it. There never was anything at all with respect to evaluation." Thomas Levis, an associate of Mr. Scalise, testified in about the same way, that the parties were preoccupied with Cole's safety and that there was no actual discussion of examination or evaluation of her. An assistant county attorney, Rod Ryan, was present at the time the order was entered. He testified that one consideration was defendant's safekeeping, but

1. There is a dispute whether the order was valid, based upon the magistrate's subject-matter jurisdiction. While, as discussed later, the validity of an order is not solely determinative on the issue of whether the privilege applies, we assume for purposes of this division that such order was valid.

2. This rule, of course, assumes jurisdiction of the court to enter such an order. This matter is discussed in a following division.

said it was also anticipated she would be examined and evaluated under the order. As to the defendant's argument that the "examination" and "evaluation" language was only used because it happened to be part of the stock form, Ryan testified that if one had been composed for this case, "it would have been dictated almost along the same lines, but it just happened to be a form that we used." Magistrate McEniry testified in response to the question "Did you anticipate in signing the order that she was going to be evaluated by the psychiatrist?" that "I assumed she would be examined by a psychiatrist. As part of that process I imagine she would have to be evaluated as well."

Even if we were to consider the intentions of the parties, as appellant suggests, we do not believe the record supports her contention that "[t]he record unquestionably shows that Kathleen Cole was sent to Lutheran Hospital for the primary, if not the sole purpose, of obtaining diagnosis and treatment." Even under her own evidence, the commitment was for her protection; no one testified she was committed for treatment.

 The analysis of this problem is somewhat complicated in light of Dr. Taylor's testimony that he actually treated the defendant after the shooting. A doctor may be examined as to a non-privileged evaluation of a defendant even though he has also been the defendant's treating doctor. *People v. Abdul Karim Al-Kanani*, 33 N.Y.2d 260, 264, 351 N.Y.S.2d 969, 970, 307 N.E.2d 43, 44 (1973); *State v. Kulgis*, 70 Wash.2d 168, 171, 422 P.2d 480, 482 (1967). Here the doctor testified both he and the defendant expected their relationship to be confidential, with the proviso that Dr. Taylor could release the information to her attorneys. Yet, it seems clear that Dr. Taylor was informed from the beginning that he would be evaluating the defendant under the court order. The assistant county attorney who accompanied the defendant to

the hospital spoke with Dr. Taylor before he saw her, and Dr. Taylor "indicated to [him] that he could not tell [him] anything at that time." Additionally, a copy of the order was left at the hospital. We are confronted, then, with the question of whether a doctor who knows he is to conduct an evaluation for the court may nevertheless establish a confidential relationship with the patient. We do not believe that a court order may be countermanded in that manner.

 We are also mindful of the decisions in some other states which hold that the existence of the privilege is determined by the actual, subjective understanding of the patient. Those decisions are premised on the recognition that use of the subjective test would prevent "the privilege accorded the patient [from being] taken from her by trick or fraud." *Smart v. Kansas City*, 208 Mo. 162, 184, 105 S.W. 709, 717 (1907); *accord, State v. Shaw*, 106 Ariz. 103, 105–06, 471 P.2d 715, 718 (1970); *State v. Sullivan*, 60 Wash.2d 214, 224–25, 373 P.2d 474, 479 (1962). The only "evidence" of her subjective intent came in the form of her oral "confirmation" of her attorney's statement that she did not intend to waive her privilege; she did not testify to such fact. To turn the issue of the doctor-patient privilege on the subjective intent of a patient is unrealistic, in effect permitting him to await the outcome of the examination before announcing what his subjective intent was. Moreover, except in those cases in which an examination against the wishes of the defendant raises such issues as self-incrimination under the fifth amendment or effective assistance of counsel under the sixth,[3] it appears that a defendant's desires or expectations are not determinative on the issue of whether the doctor-patient privilege applies. "[C]ourts have uniformly rejected the argument that the [doctor-patient] privilege simply prohibits compelling an accused to submit to an examination." McCormick, *supra*, § 134, at 286. The order clearly provided for examination, not treat-

3. *See* Note, *Protecting the Confidentiality of Pretrial Psychiatric Disclosures: A Survey of* Standards, 51 N.Y.U.L.Rev. 409 (1976).

ment. The subjective intent or expectations of defendant in obtaining the order for commitment and in submitting to the ensuing examination cannot change that.

■ The State is entitled to be treated fairly when dealing with a statutory privilege. *See State v. Tensley*, 249 N.W.2d 659, 662 (Iowa 1977) (attorney-client privilege) ("we believe it would be unfair to permit the defense to elicit favorable aspects of the communication without permitting the prosecution an opportunity to elicit unfavorable aspects."). By the time the deposition of Dr. Taylor was sought and resisted, thereby making it obvious the defendant challenged the evaluation provisions of the order, the value of another examination would have been seriously depreciated by the passage of time. We do not believe the privilege may be used in this manner. A rule designed as a shield against improper dissemination of information for proper medical treatment would in effect become a sword in the hands of a litigant, frustrating a court's search for facts. It cannot be both. 8 J. Wigmore, *supra*, § 2388, at 855.

■ A further observation by Wigmore is pertinent: The policy reasons behind the doctor-patient privilege are hardly served where, as here, it is not evidence of some dreaded or embarrassing disease which the defendant desires to have excluded but rather, evidence of her *good* health. *Ibid.*

B. *Waiver of the privilege.* The State argues that, even if we find the privilege arose, the defendant waived it by putting her mental condition in issue. We need not address the issue, because we find no privilege existed. However, we discuss it briefly because of its importance in future cases. Wigmore has said that "[a] waiver is to be predicated not only when the conduct indicates a plain intention to abandon the privilege, but also when the conduct (though not evincing that intention) places the claimant in such position, with reference to the evidence, that it would be unfair and inconsistent to permit the retention of the privilege." 8 J. Wigmore, *supra*, § 2388, at 855. The author illustrated the point, in the context of a civil suit, this way:

By any other conclusion the law practically permits the plaintiff to make a claim somewhat as follows: "I tender witnesses A, B and C, who will openly prove the severe nature of my injuries. But I object to the testimony of witness D, a physician called by the opponent to prove that my injury is not so severe as I claim, because it is extremely repugnant to me that my neighbors should learn the nature of my injury"!

*Id. Accord,* McCormick, *supra,* § 103, at 221.

Several courts have held that a plea of insanity or diminished capacity waives the privilege by putting the matter in issue. *See, e. g., Bailey v. State,* 264 Ind. 505, 346 N.E.2d 741, 745 (1976); *Lockridge v. State,* 263 Ind. 678, 338 N.E.2d 275, 281–82 (1976); *State v. Aucoin,* 362 So.2d 503, 504–06 (La. 1978) (State called defendant's treating doctor; privilege held waived by raising issue of insanity); *State v. Berry,* 324 So.2d 822, 827–28 (La.1975) (waived by plea of insanity); *accord,* McCormick, *supra,* § 134, at 285–86 ("[I]t is arguable that by asserting incompetency to stand trial or nonliability by reason of insanity the accused has, to a limited extent at least, waived his right to rely on his privilege in regard to those matters."); 8 J. Wigmore, *supra,* § 2380, at 855.

■ We believe the defense of diminished capacity waived the privilege here, even if it had existed, for the simple reason it would be incongruous to allow a party to put a matter in issue and then deny access of an opposing party to relevant information concerning it. *Id.* Our modern concept of criminal trials favors full disclosure of facts, within constitutional limitations, on both sides of the table. The "sporting" theory of justice resulting from concealment and surprise is no longer the rule. *See* ABA Report, *Standards for Criminal Justice, Discovery and Procedure Before Trial* (Approved Draft 1970) at 35. Even the most restrictive authorities would say Cole would have waived the privilege by introducing evidence on it; our view that a

waiver is effected by a plea of insanity or diminished capacity merely advances the timetable to permit adequate preparation and avoids the delay which might otherwise be required to meet the defense. *See id.* at 45 ("[R]equiring disclosure [by defendant] in advance merely regulates the procedure by which he presents his case.").

The waiver issue in this case is limited to the *statutory* doctor-patient privilege of section 622.10. We have not addressed the possible constitutional implications in a forced disclosure of doctor-patient communications, which have not been raised. Issues of constitutional proportion might arise, for example, if a patient's record, including details of the current or prior crimes, is sought to be used by the prosecution in its case in chief. We have said that a seemingly disinterested third party cannot elicit information from a defendant without affording him the same protection as if the interrogation had been by the police themselves. *State v. Flaucher*, 223 N.W.2d 239, 241 (Iowa 1974) (statements to doctor withdrawing blood for alcohol analysis); *State v. Cullison*, 215 N.W.2d 309, 315 (Iowa 1974) (statements to polygraph operator). A defendant's fifth-amendment rights would obviously be involved. *See* McCormick §§ 133–34, at 282–88. And if a defense attorney seeks an independent psychiatric evaluation in order to decide whether or not to assert an insanity or diminished capacity defense he might be faced with prosecutorial intervention in that process and the resulting issue of effective assistance of counsel under the sixth amendment. *See United States v. Alvarez*, 519 F.2d 1036, 1046–47 (3d Cir. 1975); Note, *Protecting the Confidentiality of Pretrial Disclosures: A Survey of Standards*, 51 N.Y.U.L.Rev. 409, 413–17 (1976). We point out these constitutional issues to contrast them to the statutory privilege with which we are dealing in this case and to establish parameters of the waiver rule announced herein. The constitutional issues must remain to be resolved as they arise.

■ C. *Magistrate's authority to order evaluation.* The defendant seeks to avoid the effect of the order by arguing that the magistrate was without authority to enter an order for custody and evaluation. She argues that only a district court could enter such an order. The State counters that any objection to the magistrate's authority was waived because her attorney actively participated in its procurement. While we do not believe objections to subject matter jurisdiction could be "waived" by defendant, neither do we believe the admission of this evidence depends upon the authority of an issuing judge. The existence of a doctor-patient privilege does not rise or fall on the legality, or even the existence, of a court order for examination. *See State v. Nowlin*, 244 N.W.2d at 602 (non-privileged evaluation may result whether examination by court order or pursuant to private arrangement by defendant); McCormick, *supra*, § 99, at 213–14 (evaluation by arrangement of police officer, prosecutor, opposing party, or party's own attorney as well as by court order, may produce non-privileged evidence). The test is still whether the three elements of the privilege are established. *State v. Nowlin*, 244 N.W.2d at 602.

■ An order such as the one here, though, furnishes strong evidence of the nature of the relationship which follows. It is upon that rationale that we have examined it here and have concluded that the doctor-patient privilege is inapplicable. In summary, we hold that because Dr. Taylor's and Dr. Varner's contacts with the defendant after September 15 were to conduct a court-ordered evaluation of her mental condition, no doctor-patient privilege arose with respect to that contact. The order for evaluation, because it is merely evidence of the relationship which followed, does not rest for its probative value upon either the court's authority to issue it nor upon any waiver of the jurisdictional objection on the part of the defendant. Where the privilege does not arise because the contact was for the purpose of conducting a court-ordered examination, it cannot be created by an understanding of the doctor and the patient that the communications will be confidential. Finally, we conclude that even if the

privilege had existed, defendant waived it by placing the matter in issue.

■ D. *The hypothetical question.* At trial Dr. Taylor was asked to assume certain facts and give his opinion as to whether the defendant was capable of forming specific intent, to counter defendant's claim of diminished responsibility. This has been a recognized method of producing medical or psychiatric evidence without regard to the doctor-patient privilege, the opinion presumably being based upon the facts presented by the examining lawyer and not upon any communications with the patient. *Crago v. City of Cedar Rapids*, 123 Iowa 48, 49, 98 N.W. 354, 355 (1904); 3 Wharton, *supra*, § 563, at 88; 8 J. Wigmore, *supra*, § 2382, at 841. However, if the witness is incapable of separating privileged facts from non-privileged facts in answering the hypothetical, application of the privilege will usually result in inadmissibility of the opinion. *Id.* The defendant contends this was the situation in this case. Dr. Taylor was called by the State and testified extensively. He was asked whether he could form an opinion of the defendant's M'Naughten sanity based only on information from a hypothetical and his post-arrest contact with her. He responded that he could, although he admitted that he could not form a medical *diagnosis* based only on that information. However, the diagnosis of her problem, if any, is not an issue. He testified that he could completely divorce his pre-arrest contact with the defendant in forming his opinion on her sanity. He was then questioned regarding the defense of diminished capacity; he testified he could form an opinion on her capacity based solely on the post-arrest contact. He admitted on defendant's voir dire that pre-arrest contact would "necessarily affect [his] judgment with respect" to her mental capacity. Upon further examination by the State, however, he testified that, based only on his contact with the defendant after the order of commitment, there was "no indication that any condition existed which might have impaired her ability to premeditate and deliberate with the intent to kill." The appellant now contends that this pre-arrest treatment of the defendant so affected his testimony that a hypothetical-question approach could not avoid the bar of the patient privilege.

■ The admissibility of opinion testimony rests with the trial court, and we will interfere only if there is manifest abuse of that discretion. *Becker v. D & E Distributing Co.*, 247 N.W.2d 727, 733 (Iowa 1976). Here, it is true the doctor retracted some when pressed by the defendant's voir dire, but it should be pointed out that he said his opinion on diminished capacity would be "affected" by the pre-order treatment of Cole; he did not say the opinion could not be rendered without reference to his earlier exposure to her. In fact, upon further examination he said he *could* give such opinion without regard to the period preceding the evaluation order. We therefore do not believe the court abused its discretion in allowing the opinion on diminished capacity to be expressed in the context of the hypothetical question, because it was not shown to be dependent upon privileged information.

E. *Refusal to strike testimony of psychiatrist.* As discussed in subdivision A, the State questioned Dr. Taylor at length about his examination of this defendant. Her attorney objected throughout his testimony on the basis of the doctor-patient privilege. Shortly after defendant's cross-examination of Dr. Taylor began, he was asked by her attorney about his treatment of Cole after the shooting. The following exchange ensued:

[Dr. Taylor:] Mr. Sandre [one of defendant's attorneys], I explained my position on Thursday that I am unwilling, *without Mrs. Cole's permission*, to discuss any further content of any of my directions to her.

[Mr. Sandre:] You understand, Doctor, I am talking about the period of time between the 15th day of September and the 30th day of September, 1977. You understand that?

[Dr. Taylor:] Yes, I understand that.

[Mr. Sandre:] And do I understand that you are unwilling to answer my questions that I propose to you with respect to that period of time in terms of your relation with Mrs. Cole?

[Dr. Taylor:] You understand me correctly. [Emphasis added.]

Defendant then moved to strike all of Dr. Taylor's testimony on the basis that she had been denied adequate cross-examination. The trial court refused to strike the testimony. Defendant's counsel again asked Dr. Taylor if he refused to answer the question; the witness responded "I am not refusing to answer your questions, Mr. Sandre . . . She has not waived [her privilege], so I am unwilling to divulge any information that I have received from Mrs. Cole." A motion to strike the direct testimony was again denied. Dr. Taylor did not refuse to answer defendant's questions; he only refused to answer any more of them until the "privilege" (which we have previously decided did not actually exist) was waived by her.

The defendant was the only party who could waive the privilege, if it had existed. She therefore had the key to unlock the evidence which she was seeking, and she refused to use it. This anomalous situation could have been resolved if she had merely given her consent to Dr. Taylor's testimony. She argues on appeal, however, that this would have waived the privilege in toto and would have been inconsistent with her position that all of Dr. Taylor's testimony was inadmissible under the privilege. However, for the reasons already discussed, the examination was not covered by the privilege; the defendant would have lost nothing by acceding to the doctor's request for permission to answer her own questions. The "dilemma" Cole now complains of, a choice between her sixth-amendment right to full cross-examination and exercising her doctor-patient privilege, is therefore non-existent; the latter option did not exist anyway.

■■■ Further, not every refusal to answer by a witness on cross-examination requires the striking of his direct testimony; whether to strike it under such circum-

stances is largely left to the discretion of the trial court. *See United States v. Cardillo*, 316 F.2d 606, 613 (2d Cir. 1963). The fact the evidence sought is merely cumulative may be considered in making that decision. *Cardillo*, 316 F.2d at 613 (cumulative testimony regarding credibility of witness refusing to answer on self-incrimination grounds). Here, the questions at which the doctor began to balk involved the post-arrest examination period. The specific question posed was "on the 15th day of September, 1977, when you saw Mrs. Cole in the hospital did you ever advise her of her rights against self-incrimination?" The doctor refused to answer. Without asking any further questions of the witness, the defendant moved to strike.

■■■ There is no showing, first, that self-incrimination was ever an issue, and defendant makes no attempt to show her failure to obtain an answer to that question prejudiced her defense. Second, the record does not reveal a serious effort to protect the confrontation rights of this defendant. There were several courses open to the defense: They could have relied on the trial court's ruling that they had already waived the privilege with respect to the latter period, reaffirmed only shortly before, or ask that the doctor be ordered to testify or found in contempt. (The record reveals a willingness of the doctor to comply with any such order.) Instead, defense counsel chose the course of action least likely to induce the doctor's testimony. *See State v. Brown*, 549 S.W.2d 336, 341 (Mo.1977) ("The contempt sanction is coercive upon the witness himself but the sanction of striking all of the witness's testimony may or may not be coercive with respect to the witness. . . . [I]f the witness is not a party such a threat is not coercive as to the witness at all."). The defendant having failed to seek less drastic yet more effective sanctions, we hold the trial court did not abuse its discretion in refusing to strike the direct testimony of Dr. Taylor.

II. *Admission of items seized.*

The State offered in evidence several items seized from the defendant's car: her

purse, an empty gun box and an opened box of .38 caliber shells. Defendant objected on the ground that these had been seized without a warrant. The State first proposed to establish the issuance of the warrant; then, apparently concluding a valid warrant had not been issued, relied upon the fact the defendant had not raised the issue in a timely-filed motion to suppress under Iowa R.Crim.P. 10(2)(c), (4) (within thirty days of arraignment or prior to impaneling of trial jury, whichever occurs earlier, unless extended "for good cause shown") and a local rule in Polk County which imposed even more stringent time restrictions. The subject is also addressed in Iowa R.Crim.P. 11(1): "The motion [to suppress] shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was unaware of the *factual* grounds for the motion; but the court in its discretion may entertain the motion at the trial or hearing, upon good cause supported by affidavit." (Emphasis added.)

The defendant contends that admission by the court of these items on the basis of her failure to object in the manner provided by the rules was erroneous because her attorneys did not know until the items were presented in court that a warrant had not been obtained. This, she contends, is good cause to excuse her failure to comply with the rules. As a basis for the objection at trial, her attorney stated "I want to say very frankly that this is the very first time that any of us knew that a search took place, and if the court would look at Officer Lumley's minutes of his testimony, you will find, Your Honor, that there is not one word in there about there was a search."

Defendant relies upon *State v. Davis*, 261 Iowa 1351, 1356, 157 N.W.2d 907, 910 (1968), which stated "the well established rule that, unless a defendant who is forewarned as to the substance of testimony to be offered makes a proper and timely motion to suppress such evidence before trial, any objection to its introduction will be deemed waived." *Davis* was decided prior to enactment of our criminal rules. It held that a defendant who had knowledge of the grounds for objection and failed to do so

waived the objection. The "forewarning" language of *Davis* seems to be interpreted by the defendant as requiring the State to advise her of the specific basis upon which to make the objection. The trial court ruled that Cole had a duty to make some investigation, ask for a bill of particulars or use some other means in order to decide whether or not to file a motion to suppress. It ruled that her objections were untimely.

■ The minutes of testimony attached to the county attorney's information included those of the officer who seized the evidence. They stated:

This witness will testify that he seized numerous items of evidence and received other items of evidence from witnesses and officers at the scene of the shooting, including the revolver, the box of cartridges, a picture, etc. He will describe in further detail all of the other facts and circumstances observed by him in connection with these events.

It is true, as defendant's counsel pointed out at trial, that there was no mention of a "search" in these minutes; however, it specifically refers to a "seizure" of a "box of cartridges, a picture, etc." We agree with the trial court that there was enough information in the possession of defendant to inform her of the facts necessary to file a motion to suppress or at least to prompt her to make further investigation. Although she might not have been made aware by these minutes of the *legal* basis for objection, she was clearly alerted to the *factual* basis for it, as provided for in Rule 11(1).

■ Further, any error on this issue was clearly harmless. Her own witness, Dr. Varner, testified she recounted to him the details of how the gun, purse and shells were placed by her in her car. Several prosecution witnesses testified she admitted shooting the victim. She even states on appeal that "[t]he sole issue in this trial was Kathleen Cole's mental ability to form the specific intent for first degree murder." The evidence in question was probative of the defendant's identity as the person who shot Dr. Tyler, an issue not disputed by her.

It was not probative of her capacity to premeditate, deliberate and form the specific intent to kill, which were the disputed issues at trial. Thus, introduction of the evidence could not have influenced the verdict. Federal constitutional error does not necessarily require reversal; the conviction may be affirmed if introduction of the evidence "was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 711 (1967). *Accord, State v. Porter*, 283 N.W.2d 351, 353 (Iowa 1979); *State v. Trudo*, 253 N.W.2d 101, 107 (Iowa 1977). The burden of proving harmlessness beyond a reasonable doubt is upon the State. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710. Even assuming the introduction of these exhibits was error, we believe it was harmless beyond a reasonable doubt.

III. *Deposition of defendant's husband.*

Prior to trial, and over the defendant's objection, the trial court granted the State's request that she be ordered to inform the State whether her husband would testify at trial or exercise the inter-spousal communication privilege of section 622.9, The Code. She responded that he would testify; the State then took his deposition.

The defendant contends this was error, because there is no authority to force her to disclose whether or not her spouse would testify nor to take his deposition in the face of the privilege. The deposition was not used in the State's case in chief but apparently had been taken, and presumably used, for impeaching the husband's testimony during cross-examination.

The defendant does not show, or even claim, any prejudice because of the alleged error. Prejudice must be shown before any such error will require reversal. *See State v. Pepples*, 250 N.W.2d 390, 394 (Iowa 1977) (spouse's evidence cumulative; held not reversible error); *State v. Donovan*, 263 N.W. 516, 517 (Iowa 1935). The only deposition testimony of the defendant's husband which is directed to our attention by her on this appeal relates to his name and address. If there is any preju-

dice to defendant under this record, she has failed to point it out to us.

We find no reversible error; we therefore affirm the trial court.

AFFIRMED.

All Justices concur except HARRIS, J., who dissents, joined by REES and ALLBEE, JJ.

REYNOLDSON, C. J., and McCORMICK, J., take no part.

HARRIS, Justice (dissenting).

Because of one clearly established fact and one settled rule of law I think the trial court should be reversed and the case remanded for a new trial. The fact is that Dr. Taylor was selected to attend the defendant after her arrest for the very reason that he had been and would continue to be her treating physician. The rule is that under these circumstances the physician-patient privilege was not waived. It was reversible error under section 622.10, The Code 1979, to admit Dr. Taylor's testimony.

The defendant admittedly shot and killed her former husband. Her defense is only and simply that she was not herself when she did so. Given the brutality of her act such a defense is apt to meet with considerable skepticism. Claims of diminished responsibility are rarely attractive. But under Iowa R.Cr.P. 10(10)(b) and 21(8) we recognize such a defense and we should accord this defendant a full opportunity to try to claim it.

The order by which the magistrate committed defendant to the hospital was obtained through the joint efforts of the defendant's counsel and the assistant county attorney. Counsel sought this order for reasons which were in part similar and in part differing. Defendant's counsel's motives were custodial. There was an overriding concern for the defendant's emotional and mental state, especially her suicidal tendencies. The prosecutor then assigned to the case was certainly, and quite properly, sympathetic to these concerns. Because custodial care under the circumstances is

not easily come by, the procedure employed seemed then to be consistent with the interests of both the defendant and the State. It was then already clear that diminished responsibility would be the fighting issue in any future trial. The magistrate expected an evaluation and report but recognized that counsel's concern and the magistrate's own primary concern was to submit defendant to hospital care. Any evaluation of defendant was of secondary concern.

The psychiatrist selected in the court order was of defendant's own choosing and her reason for choosing him was and is of crucial importance. Defendant had been under his private care and Dr. Taylor was named in the order of commitment for evaluation for that very reason. The doctor's two professional roles, first as defendant's treating physician, and also under the magistrate's order, led to a hotly controverted claim of doctor-patient privilege under section 622.10.

I. There is obvious tension between the statutory privilege and the purpose stated in the magistrate's order submitting the defendant for psychiatric and physical examination and evaluation. The defendant has consistently taken the position that the magistrate's order, notwithstanding the language used or the form in which it was drawn, was not for the purpose of evaluation but rather was because of her suicidal tendencies and consequent need to have her psychiatrist attend her. The State first urges that, because of the order, especially in view of its form and language, no doctor-patient privilege arose.

This strikes me as absolutely contrary to our prior holdings. In *State v. Mayhew*, 170 N.W.2d 608, 615 (Iowa 1969), and again in *State v. Nowlin*, 244 N.W.2d 596, 602 (Iowa 1976), we subscribed to a "sole purpose" rule. We said:

The physician-patient privilege does not arise where on order of the court a defendant is examined to determine his mental or physical condition. [Authorities.]

The cited cases distinguish between an examination of a defendant *solely to as-* *certain his mental and physical condition as opposed to diagnosis and treatment.* Only in the former situation is the privilege unavailable, in the latter situation the defendant still can invoke the privilege.

*Mayhew*, 170 N.W.2d at 615 (emphasis added).

The majority should not apply the quoted general rule without observing the quoted exception. The majority's rationale, as I understand it, is that the magistrate's order committing defendant to Dr. Taylor is absolute and clear on its face so we should ignore the clear record made on the order's purpose. But our cases heretofore have not indicated that a court order or decree should give rise to an unintended result by inadvertent language. *Dairyland, Inc. v. Jenison*, 207 N.W.2d 753, 754–55 (Iowa 1973). The circumstances surrounding its entry are relevant to show its meaning. *Id.* at 755. Both the State and defendant offered testimony regarding the circumstances surrounding the entry of the order and its intent and purpose.

The factual dispute is so limited as to be unimportant. As noted, the defendant believes the order was only for defendant's custody and protection. The State and the magistrate himself take the position that the order had a dual purpose. Defendant would receive hospital care and there would be the evaluation of defendant's condition and a report to the court. Although the defendant does not agree that the order's purpose included the evaluation and report, the disagreement can remain unresolved or even be resolved in favor of the State. Either way the sole purpose rule contemplated in *Mayhew* and *Nowlin* was not satisfied.

In my view the doctor-patient privilege did arise. It clearly existed prior to the court order. It persisted thereafter because of the dual purpose of Dr. Taylor's professional involvement after the order was entered. The error in admitting his testimony was further demonstrated by his testimony that his professional views concerning the defendant arose from the professional rela-

tionship both before and after the order. The observations had become merged in his own mind so that he could not separate them into periods before and after the order.

II. In division I(B) of the majority opinion it is suggested, though apparently not held, that defendant may have waived the privilege. The State advances two alternative theories in support of its position that the doctor-patient privilege was waived. As the first alternative the State urges that all doctor-patient privilege is waived whenever insanity or diminished responsibility is raised as a defense. I do not subscribe to the view that a waiver is effected when insanity or diminished responsibility is raised as a defense. There would be no need or reason for a sole purpose rule under such a waiver rule. We would never reach the question of sole purpose because the waiver would wipe out any reason to inquire into the purpose of the commitment.

I think the waiver rule the State urges is at odds with the better reasoned conception of the policy behind the physician-patient privilege. The authorities supporting the waiver rule proceed from the view that the privilege is grounded in the right of privacy:

> The whole reason for the privilege is the patient's supposed unwillingness that the ailment should be disclosed to the world at large; hence the bringing of a suit in which the very declaration, and much more the proof, discloses the ailment to the world at large, is of itself an indication that the supposed repugnancy to disclosure does not exist.

8 Wigmore, Evidence, § 2389 at 855.

Other policy considerations beyond the mere right of privacy also support the rule. There is a strong social interest in fostering full and complete disclosure by patients to doctors. This is quite aside from any fears that the public or one's neighbors may learn of a mental affliction. Even if the affliction becomes public knowledge there remains an advantage, which translates into public interest, when a patient can make a full disclosure to a physician without fear-

ing some repercussion at trial. *Collins v. Auger*, 428 F.Supp. 1079, 1082–84 (S.D. Iowa 1977), vacated on other grounds in *Collins v. Auger*, 577 F.2d 1107 (8th Cir. 1978).

The State alternatively argues that the defendant waived the doctor-patient privilege by participating in and submitting to the court order for evaluation under these circumstances. Once again I must disagree on the basis of the sole purpose doctrine. The court-ordered evaluation and report was not the sole purpose for defendant's commitment to Dr. Taylor.

The State next points to the express waiver by defendant's counsel to the procedure employed by the magistrate at the time of the order. But I believe the waiver by defendant's counsel went only to the magistrate's lack of authority and did not reach defendant's privilege. Under section 748.2, The Code 1977, the magistrate had only "power to hear complaints, or preliminary informations, issue warrants, order arrests, require security to keep the peace, make commitments, and take bail, as provided by law." *See* § 602.60, The Code 1979. This statutory enumeration must be read strictly. *State v. Iverson*, 272 N.W.2d 1, 3 (Iowa 1978). So there was considerable doubt in the magistrate's mind and in those of counsel that the magistrate held authority to enter the order of commitment. He was urged to do so by defendant's counsel who expressly waived any objection to his lack of authority. There was nothing, however, in that express waiver which even remotely approached a waiver of doctor-patient privilege. There was nothing to suggest that the waiver indeed went any further than defendant's counsel admits. Defendant abided by the waiver. There has been no objection at any time to the magistrate's authority to commit defendant at the time, under the circumstances, and for the purposes intended. This, under the defendant's view of the record, was limited to custodial care and treatment for the defendant and to prevent a suicide. This, under the State's view of the record, was for the dual purpose of care and treatment

coupled with evaluation. But it is not right to attach the State's intent at the time as a ground for the defendant's waiver.

III. Therefore I believe we should reject both of the State's alternative theories of waiver. The general theory of waiver should be rejected on the basis of the better reasoned cases. The argument that a waiver was effected by the special facts here ignores defendant's dilemma. She needed hospitalization and care. The magistrate lacked jurisdiction to order it but did so when objection to the lack was waived. The effect is that defendant's privilege was lost unknowingly and the loss is required of her, under the majority holding, as a price for the hospitalization. I think it is not accurate to justify this result as the majority attempts to do on the basis of fairness.

The majority seems to suggest that Dr. Taylor's professional care of the defendant, when she was placed in hospital custody for fear of suicidal tendencies, was not treatment. I reject any such view. It seems manifest that commitment and care for such a patient by a psychiatrist is treatment within the meaning of the privilege.

It is unnecessary to extend this dissent by discussion of the other assignments. In view of the affirmance by the majority it is enough for me to say that on the foregoing ground I believe the judgment of the trial court should be reversed.

REES and ALLBEE, JJ., join this dissent.