STATE of Iowa, Appellee,

v.

Sean Michael RHOMBERG, Appellant.

No. 92–1987.

Supreme Court of Iowa.

May 25, 1994.

Linda Del Gallo, State Appellate Defender, and B. John Burns, Asst. State Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Thomas S. Tauber, Asst. Atty. Gen., Fred H. McCaw, County Atty., and Ralph Potter and Lyle R. Galliart, Asst. County Attys., for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, SNELL, and TERNUS, JJ.

SNELL, Justice.

Defendant, Sean Michael Rhomberg, appeals from his conviction by jury of first-degree murder in violation of Iowa Code section 707.2(2) (1991). Having reviewed the issues raised on appeal, we now affirm the conviction.

Our review of the district court rulings is at law. Iowa R.Crim. P. 102; Iowa R.App. P. 4.

Marian Carpentier was found dead on the living room floor of her home by her neighbors. She died of a stab wound to her neck that caused extensive blood loss and spinal cord damage. The police followed a trail of her blood from her home to the home where Sean Rhomberg resided. He was found there with a bandage on his left hand.

In the custody of police, Rhomberg first indicated he had injured his hand in a fall. When the police officer expressed disbelief of this statement, Rhomberg admitted it was a lie and that he had actually injured his hand "when the lady on Garfield poked him with a knife cutting the back of his hand." He then told the police officer that as he struggled for the knife, she fell backwards and stabbed herself. Rhomberg admitted that he went to the victim's home to rob her, knew she was elderly and that he could handle her without a weapon. He stated he was not drunk and had not used drugs or alcohol for quite some time.

Rhomberg relied at trial upon defenses of diminished capacity and insanity. The defense was based on expert testimony that he suffered from frontal lobe brain damage, one symptom of which is a disinhibition of aggression or rage, along with organic mood disorder.

■ I. The first issue raised on appeal involves our felony murder rule. The rule is attacked as illogical and defendant asks for the adoption of an "independent felony rule." Iowa Code sections 707.2(1) and (2) provide in relevant part:

A person commits murder in the first degree when the person commits murder under any of the following circumstances:
(1) The person willfully, deliberately, and with premeditation kills another person.
(2) The person kills another person while participating in a forcible felony.

A forcible felony is defined in section 702.11 as follows: "A 'forcible felony' is any felonious child endangerment, assault, murder, sexual abuse . . ., kidnapping, robbery, arson in the first degree, or burglary in the first degree." The argument Rhomberg makes is that the combining of sections 707.-2(2) and 702.11 into what is called the "felony murder rule" creates an anomaly whereby the distinguishing elements of first-degree murder stated in section 707.2(1) are eliminated. Specifically, Rhomberg argues the elements of premeditation, deliberation and malice aforethought, distinguishing first-degree murder from second-degree murder, are ignored or short circuited. The error in this law is claimed to be displayed by its inconsistent structure and by the result of its application, which, Rhomberg asserts, allows for easy convictions of first-degree murder committed with a forcible felony.

The focus of Rhomberg's attack on the statute is that it allows the first-degree mur-

der convictions to be based on a jury finding that defendant participated in either the offense of robbery or willful injury at the time of the killing. He urges the acceptance of the "merger doctrine" whereby a felonious assault such as a willful injury would not be the basis for a first-degree murder conviction.

We have examined the felony murder rule as structured in Iowa on several occasions. *See State v. Beeman,* 315 N.W.2d 770, 776–77 (Iowa 1982); *State v. Mayberry,* 411 N.W.2d 677, 682–83 (Iowa 1987); *State v. Ragland,* 420 N.W.2d 791, 793 (Iowa 1988). In *Beeman,* we examined the arguments criticizing the felony murder rule and rejected them. *Beeman,* 315 N.W.2d at 776–77. We concluded that the inclusion of felonious assault in sections 707.2(2) and 702.11 indicated a legislative intent that a willful injury may serve as a basis for a felony murder and that the merger doctrine does not apply to such an assault. *Id.* In *Mayberry,* we again rejected the legal premise questioning the felony murder rule. *Mayberry,* 411 N.W.2d at 682–83. In *Ragland,* we reviewed the felony of willful injury as the underlying felony for the felony murder rule and found no reason to retreat from our previous decisions. *Ragland,* 420 N.W.2d at 793. We have now reexamined the argument made in the case at bar by Rhomberg and confirm our prior analyses. A proposed change in the law, if desired, is in the province of the legislature.

■■ II. A second issue challenges the validity of the jury selection process from which Rhomberg's jury was chosen. Because this argument raises a constitutional challenge, we review this issue de novo. *State v. Hilleshiem,* 291 N.W.2d 314, 316 (Iowa 1980). Three Black Hawk County jury commissioners compiled a master jury list of 7500 names. The names were selected using source lists as prescribed by Iowa Code section 607A.22 consisting of registered voters, licensed drivers, Waterloo and Cedar Falls city directories, the U.S. West telephone book, and the student directory of the University of Northern Iowa. Because these source lists rarely indicated the race of a person, one of the commissioners became concerned that a fair proportion of minorities was not being included. To remedy this, one commissioner abandoned the random selection required by Iowa Code sections 607A.1, and 607A.3(8), and hand picked names of black people known by her, her family, or who were members of predominantly black churches. The commissioner included these names in the master jury pool attempting to select a percentage of minority jurors that would be consistent with the percentage of minorities in the general population as shown by the 1990 census. Rhomberg asserts that this process affected the validity of the jury that convicted him and constitutes reversible error.

Specifically, Rhomberg claims his right to equal protection under the Fourteenth Amendment to the United States Constitution was violated. The United States Supreme Court has stated: "[jurors] should be selected as individuals, on the basis of individual qualifications, and not as members of a race." *Cassell v. Texas,* 339 U.S. 282, 286, 70 S.Ct. 629, 631, 94 L.Ed. 839, 847 (1950). "An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." *Id.* 339 U.S. at 287, 70 S.Ct. at 632, 94 L.Ed. at 847. In *State v. Jones,* 490 N.W.2d 787, 793–94 (Iowa 1992), we held that to show an equal protection violation, the defendant must show that the procedure in selecting the venire resulted in substantial under representation of the defendant's race or group. Rhomberg does not allege, and the record is devoid of proof, that white citizens like himself were substantially under represented in the master list. His equal protection issue is meritless.

■ Rhomberg also claims that the polluted procedure by which the master list was compiled violated Iowa Code section 607A.1 which provides:

It is the policy of this state that all persons be selected at random from a fair cross section of the population of the area served by the court, and that a person shall have both the opportunity in accordance with the provisions of law to be considered for jury service in this state and the obligation to serve as a juror when selected.

The record shows uncontroverted testimony that the 500 name jury pools were selected randomly from the master list of 7500 names. From the 500 name jury pool, the jury panel for Rhomberg's case was randomly selected. Rhomberg does not make any allegations to the contrary. His argument is directed solely to the selection process for the master list, whose alleged tainting poisoned the entire jury selection process.

While we do not approve of the commissioner's act, unilaterally taken without statutory approval, albeit to achieve the worthy purpose of fairly representing minorities, we do not believe Rhomberg's rights were thereby adversely affected. In *State v. Dohrn*, 259 N.W.2d 801, 804 (Iowa 1977), we held that a variance from the statutory procedure in the selection of a grand jury did not prejudice a defendant unless it infringed his substantive rights. We held that the burden of showing prejudice rests with the defendant. *Id.* We required a showing of prejudice in affirming the conviction in *State v. Lohr*, 266 N.W.2d 1, 6 (Iowa 1978), where the process for selecting the jury panel was challenged. Again, in *Cooper v. State*, 379 N.W.2d 917, 918 (Iowa 1986), the failure to show prejudice in a challenge to the trial jury selection process defeated the claim.

In the case at bar, no prejudice has been shown to affect Rhomberg's jury as a result of the deviation from the statutory process used in assembling the master jury list. We reject Rhomberg's implicit argument that any pollution of the process, however slight, is fatal. The State has shown that these constitutional and statutory claims regarding the jury selection process are without merit.

■ III. A third issue is that the admission of inculpatory statements by Rhomberg violated his constitutional rights under the Fifth Amendment. In *State v. Reid*, 394 N.W.2d 399, 402 (Iowa 1986) we said:

> The State is charged with the burden of proving the voluntariness of a defendant's confession by a preponderance of the evidence, as a prerequisite to its admission in evidence. And, where the State is unable to sustain its burden, the defendant's inculpatory statements and confession must be suppressed and may not be admitted into evidence.

> The test of voluntariness of an inculpatory statement or confession is 'whether the defendant's will was overborne by the police officers' considering 'the totality of the circumstances.'

(Citations omitted.) Among the circumstances listed in *Reid* as relevant include the defendant's knowledge and waiver of his Miranda rights. In *State v. Munro*, 295 N.W.2d 437, 443 (Iowa 1980) we recognized as significant the defendant's ability to control his conduct enough to negotiate with authorities regarding his rights. *See also State v. Jump*, 269 N.W.2d 417, 425 (Iowa 1978) (defendant's physical and emotional condition and reaction to the interrogation is significant); *State v. Cullison*, 227 N.W.2d 121, 129 (Iowa 1975) (any mental weakness the defendant may possess must be considered).

At the time of Rhomberg's arrest, he was fifteen-and-a-half years old. He was tried as an adult. Rhomberg's verbal I.Q. is seventy. His full-scale I.Q. is eighty. At the interrogation upon arrest, both of Rhomberg's parents agreed to allow Rhomberg to be questioned and Rhomberg's mother signed the form. Although invited by the police officer to attend the interrogation, neither parent attended because Mrs. Rhomberg was too upset and Mr. Rhomberg took her home. Rhomberg told the police he did not read well and asked that the waiver form be read to him. After it was read to him he signed it.

In moving to suppress Rhomberg's incriminating statements, evidence by Dr. W.H. Verduyn, M.D. was introduced that Rhomberg had suffered a brain injury in the past that impacted upon his ability to understand his Miranda rights. Dr. George S. Barloff, a professor of psychology at the University of North Carolina, also testified. He met with Rhomberg for forty-five minutes and concluded Rhomberg understood some of the components of the Miranda protection but did not understand others. He testified:

> In my view he did not make a knowing and intelligent waiver. He had, at best, fragmentary knowledge of his rights. And I

think most importantly he had no clear understanding of the relationship of the waiving of those rights and their consequences with regard to self-incrimination.

Dr. Barloff had conducted research on the intellectual ability needed to comprehend the Miranda warnings and found that persons with an I.Q. of seventy and below had difficulty understanding the warnings. Dr. Barloff's research was based on the standard Miranda form. Rhomberg was given and signed a special juvenile Miranda form that Dr. Barloff agreed would be easier to understand. He also agreed that a person of slightly lower I.Q. could understand the juvenile Miranda form.

At the suppression hearing Rhomberg commented "that he knew what the form meant and he understood it and that he had been read the form before and had signed the form before." The officer believed Rhomberg could understand oral questions and statements as well as a normal fifteen-year old and that he had made an intelligent waiver of his rights. The interviewing process was lengthy, lasting from 1:30 p.m. until 5:00 p.m. There were frequent breaks; Rhomberg was given the opportunity to eat or drink something which he declined and restroom breaks which he accepted. Between 7:30 p.m. and 8:10 p.m. Rhomberg made two telephone calls to his mother and began to cry when he admitted stabbing Mrs. Carpentier. This apparently was the only time he displayed any emotion.

There is no evidence that officers ever threatened Rhomberg, or promised him anything, or told him he could go home if he gave them a statement. Rhomberg never asked to see his attorney or any other attorney or indicated he wanted to stop talking. He never asked to see his parents, appeared bewildered or unable to understand the officers' questions.

Rhomberg had been taken into police custody five previous times on charges of burglary, theft and criminal mischief. Thus, he possessed past experience in being represented by an attorney. He had repeated exposure to Miranda warnings although he now argues that they were just a "ritualistic portion of what it meant to get arrested."

We have addressed the question in prior cases of mental subnormality and its effect on understanding Miranda rights. In *State v. Fetters*, 202 N.W.2d 84, 89 (Iowa 1972) we said:

> Mental subnormality on the part of one confessing to a crime does not of itself deprive the confession of voluntariness or bar its admission in evidence so long as the subnormality has not deprived the person in question of the capacity to understand the meaning and effect of the confession.

In *Reid*, 394 N.W.2d at 403, the defendant was mildly retarded with a full-scale I.Q. between seventy-four and seventy-eight and was found to have effectively understood and waived his Miranda rights. In *Fetters*, 202 N.W.2d at 90, defendant's statements were found to be voluntarily made despite an I.Q. of sixty-seven. *See also State v. Holderness*, 191 N.W.2d 642, 645–47 (Iowa 1971) (defendant could neither read nor write and had an I.Q. of seventy-seven); *State v. Snethen*, 245 N.W.2d 308, 315 (Iowa 1976) (mental abnormality).

■ Our review of this issue is de novo based on the totality of the circumstances involved in the interrogation of Rhomberg. The district court did not err in finding the statements were voluntarily made after a valid waiver of Rhomberg's Miranda rights.

■ IV. A final assignment of error arises from the allowance of rebuttal testimony by the State in calling Dr. Michael Taylor, a psychiatrist. Rhomberg's counsel had employed him while jurisdiction was in juvenile court. Counsel stated that at that time the purpose was to obtain medical evidence and opinion regarding rehabilitation of Rhomberg and to determine whether it was proper to retain him in juvenile court. Rhomberg's counsel decided not to have Dr. Taylor testify at the hearing on the question of waiving the juvenile court's jurisdiction. The juvenile court, after hearing the evidence, waived its jurisdiction. Prior to trial in district court as an adult, the State filed an application to obtain Dr. Taylor as its own witness. Rhomberg's objections were overruled and the court allowed the State to call Dr. Taylor. Dr. Taylor testified that Rhomberg suffered

**808**

from some sort of learning disability and conduct disorder but had the ability to form specific intent. Dr. Taylor testified that Rhomberg did not suffer from any partial complex seizure disorder.

On appeal Rhomberg claims the admission of Dr. Taylor's testimony violated the physician-patient privilege of Iowa Code section 622.10. His argument is that the retaining of Dr. Taylor by defense counsel to examine Rhomberg was done "in the best interest of the child" as the court is authorized to do under Iowa Code section 232.49(3)(a). As such, he argues the mental examination was for treatment as a juvenile, not for obtaining assistance in pending litigation.

In *State v. McDaniel*, 485 N.W.2d 630 (Iowa 1992), we held that the physician-patient privilege does not preclude the State from calling a psychiatrist, earlier retained but not called by the defendant, as a witness against a defendant. One of the elements necessary to invoke the privilege is that the information obtained by the doctor is necessary to treat the patient. In seeking testimony from the psychiatrist for use in the instant case at the juvenile court hearing on waiving jurisdiction, we find the purpose was not for treatment of Rhomberg but was for a litigation purpose. The physician-patient privilege did not apply. We also note that the privilege does not attach when the defendant, as here, gives notice of the defense of insanity or diminished responsibility. *State v. Craney*, 347 N.W.2d 668, 672 (Iowa 1984); *State v. Cole*, 295 N.W.2d 29, 35 (Iowa 1980).

The conviction is affirmed.

**AFFIRMED.**