David **FOELL**, Petitioner,

v.

John **MATHES**, Warden, Iowa State Penitentiary, Respondent.

No. C02–3029–MWB.

United States District Court, N.D. Iowa, Central Division.

March 19, 2004.

David Foell, Fort Madison, IA, pro se.

Mark C. Meyer, Kinnamon–Kinnamon–Russo–Meyer, Cedar Rapids, IA, for Plaintiff.

Thomas W. Andrews, Des Moines, IA, for Defendant.

## ORDER REGARDING MAGISTRATE'S REPORT AND RECOMMENDATION ON PETITIONER'S WRIT OF HABEAS CORPUS

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1023
 A. *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1023
 B. *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1024
 C. *Decisions Below* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1031

1. Direct appeal ............................................... 1031
2. Post–conviction relief application hearing .......................... 1032
3. Appeal of denial of post-conviction relief application ................. 1032

II. LEGAL ANALYSIS .............................................. 1033
 A. Standard Of Review ........................................ 1033
 B. Objections To Findings of Fact ............................... 1033
 1. Timeliness and content of reports on petitioner's mental condition.... 1033
 a. Report of psychiatric social worker Jim Anderson ................ 1034
 b. Report of psychiatrist Dr. Greg Roberts ........................ 1034
 c. Report of psychologist Kenneth P. Schmitz ..................... 1034
 d. Letter from Dr. Roberts to Mr. Byrne .......................... 1036
 e. Timeline ................................................ 1036
 2. Factual finding of intent to kill by state court ....................... 1037
 3. Evidence that could have bolstered an intoxication defense ........... 1039
 4. Counsel's reasons for calling petitioner as a witness at trial ......... 1039
 C. Objections To Legal Conclusions ............................... 1040
 1. General standards for 2254 relief ................................. 1040
 2. Standards for ineffective assistance of counsel claims ................ 1041
 a. Foell's objections ......................................... 1042
 b. Magistrate's conclusions ................................... 1042
 c. Analysis ................................................ 1042
 i. Appreciation of a diminished responsibility defense .......... 1043
 ii. Untimely investigation ................................... 1048
 iii. Counsel unreasonably persuaded Foell to abandon a
 mental defense ........................................ 1048
 iv. Trial counsel presented no valid defense .................... 1049
 3. Constructive denial of counsel ................................... 1050
 D. Certificate of Appealability ................................... 1050

III. CONCLUSION ................................................ 1050

## I. INTRODUCTION

### A. Procedural Background

On May 1, 1992, petitioner David Foell ("Foell") was found guilty of first-degree Murder following a jury trial in the Iowa District Court for Bremer County.[1] On June 5, 1992, Foell was sentenced to life in prison. Foell appealed his conviction and sought reversal of his conviction on two grounds: (1) the trial court erred in denying his motion to suppress statements he made to police; and (2) that he was denied effective assistance of counsel.[2] The Iowa Court of Appeals considered the matter and affirmed Foell's First Degree Murder conviction on December 29, 1993. *State v. Foell*, 512 N.W.2d 809 (Iowa Ct.App.1993). Foell's appeal of the Iowa Court of Appeal's decision was summarily denied by the Iowa Supreme Court on March 9, 1994. Subsequently, Foell filed an Application for Post–Conviction Relief ("PCR") with the Iowa District Court for Franklin County on the grounds that he was not provided with effective assistance of counsel in several respects. A trial on Foell's PCR application was held on May 5, 1999. Following the trial, the Franklin County District

---

1. Foell was initially charged by trial information of the crime of "Murder in the First Degree" in the Iowa District Court for Franklin County on December 19, 1991. However, a change of venue ensued, resulting in Foell's jury trial in the Iowa District Court for Bremer County.

2. Patrick B. Byrne, Chief Public Defender of the Cerro Gordo Public Defenders Office, served as Foell's trial counsel. Mr. Byrne was appointed to represent Foell in the matter.

Court concluded that Foell had failed to establish ineffective assistance of counsel and overruled and denied his PCR Application in every respect. *Foell v. State*, No. PCCV002644 (Franklin County District Court Aug. 11, 2000). Foell appealed the disposition of his PCR Application. On December 28, 2001, the Iowa Court of Appeals affirmed the Franklin County District Court's denial of Foell's PCR Application. *Foell v. State*, No. 00–1536, 2001 WL 1658885 (Iowa App. Dec.28, 2001).

On April 9, 2002, Foell filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the Southern District of Iowa. On April 19, 2002, the case was transferred to this district. On May 31, 2002, the case was referred to United States Magistrate Judge Paul A. Zoss pursuant to 28 U.S.C. § 636(b)(1)(B). Petitioner filed his Brief in Support of Application for Relief Pursuant to 28 U.S.C. § 2254 on September 13, 2002. (Doc. No. 10). Respondent John Mathes ("Mathes"), the Warden of the Iowa State Penitentiary, filed a responsive brief on the merits on October 29, 2002 (Doc. No. 11), and an Appendix of Decisions on October 30, 2002. (Doc. No. 12). Mathes submitted additional supplemental materials on November 6, 2002. (Doc. No. 13). On December 13, 2002, Foell filed a reply brief. (Doc. No. 14). Mathes filed a response to Foell's reply on December 20, 2002. (Doc. No. 15). On January 2, 2003, Foell filed an addendum to his reply brief. (Doc. No. 16). On February 3, 2003, Mathes filed a Citation of Supplemental Authority in order to alert the court to a potentially pertinent decision of the Eighth Circuit Court of Appeals which came down on January 29, 2003. (Doc. No. 17). Likewise, Foell filed a response to Mathes's submission of supplemental authority on March 6, 2003. (Doc. No. 18). On February 6, 2004, Judge Zoss filed a Report and Recommendation in which he recommends that

Foell's writ of habeas corpus be denied and that a certificate of appealability not be issued. (Doc. No. 19). On February 16, 2004, Foell filed his objections to Judge Zoss's legal conclusions in his Report and Recommendation. (Doc. No. 20). The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of Foell's petition for a writ of habeas corpus.

### B. Factual Background

In his Report and Recommendation, Judge Zoss made the following findings of fact:

On December 8, 1991, Foell was introduced to an individual named Chris Oltman by a mutual acquaintance, Mark Torres. Foell rode around with Oltman, his girlfriend Jennifer Frank, and Torres, as they went to a friend's home, a couple of fast food restaurants, a Target store, and other locations. Eventually, the four drove to Sheffield, Iowa, to the home of Oltman's grandmother, Marian Atkinson. Before going to Ms. Atkinson's residence, they stopped at a gas station where Foell, who was the only one of the four over twenty-one, bought four quarts of beer. During the evening, and during the drive to Sheffield, Oltman and Torres had conversations about Torres killing Ms. Atkinson that night. Apparently, Ms. Atkinson disapproved of the relationship between Oltman and Frank, and she intended to cut Oltman out of her will. Consequently, Oltman offered to pay Torres and Foell to kill his grandmother.

When the group arrived at Ms. Atkinson's residence, Oltman went inside to talk to his grandmother, while the other three individuals remained outside in the car. Frank testified that while Oltman was inside the residence, Torres and Foell discussed how they were going to

kill Ms. Atkinson. When Oltman left his grandmother's residence, he left the garage door unlocked. He told Foell and Torres he had left the back door unlocked for them. He also told them where they could find a knife in Ms. Atkinson's kitchen, and gave them directions to her upstairs bedroom.

Foell and the other individuals went back to Mason City, Iowa, and visited an individual named Jake Frank, Jr. While they were at Jake's residence, Foell and Torres told Jake about their plans to return to Sheffield to kill Ms. Atkinson. When they left Jake's house, the others dropped Torres off at his residence, and Foell, Oltman, and Jennifer Frank left together. Later, in the early morning hours of December 9, 1991, Foell, Oltman, and Jennifer Frank were out driving near a gravel pit in Mason City, when their car became stuck. A police officer gave them a ride to a telephone at approximately 1:45 a.m., so they could call a tow truck. At approximately 2:20 a.m., Foell called Broome's Wrecker Service in Mason City. Mr. Broome testified he talked with Foell for about three minutes, during which Foell told him the car was stuck out at the gravel pit and they needed a tow. Broome stated Foell sounded "pretty excited" or "desperate," but he seemed rational and his speech was not slurred, loud, or too fast. He stated Foell mentioned he needed to get to Sheffield.

Broome dispatched a driver, Dean Porter, to meet Foell and the others at a Kum & Go station. Porter talked with Foell about payment for the tow, and he testified Foell was "antsy" or nervous, but did not appear to be intoxicated. He stated Foell had no difficulty standing, walking, or getting into the tow truck, and he did not smell of alcohol. Porter further stated he was inside Oltman's car briefly when he was hooking up the car to be towed, and he did not smell alcohol inside the car.

After Oltman's car was towed out of the gravel pit, Foell, Oltman, and Frank went back to pick up Torres, but they were unable to rouse him. At approximately 4:00 a.m., Foell, Oltman, and Frank drove back to Ms. Atkinson's residence in Sheffield. Frank testified no one forced Foell to make the trip, and he knew what he was doing and why they were returning to Sheffield. Frank stated although Foell had been drinking, he had no difficulty walking, talking, or knowing what he was doing. When they arrived in Sheffield, Oltman parked his car across the street and a little way down from his grandmother's house. Foell entered Ms. Atkinson's home through the back door Oltman had left unlocked. He went into the kitchen, found a knife, and went up the stairs to Ms. Atkinson's bedroom. Foell stabbed the woman sixteen times. He then returned to Oltman's car and told Oltman his grandmother was dead. They started to leave, but a short distance away, Foell told Oltman to stop the car because he had forgotten his glasses, which had been knocked off during the attack. Foell returned to Ms. Atkinson's house, retrieved his glasses from her bedroom floor, looked through her closet briefly to see if he could find any money, and then returned to Oltman's car. Oltman, Frank, and Foell went from the scene to a friend's house, and then out to breakfast.

Later the same day, Oltman was arrested for Ms. Atkinson's murder. Oltman gave a statement to law enforcement in which he implicated Foell as the actual killer. Oltman also stated he had offered Foell money to kill his grandmother. That evening, friends told Foell the police wanted to talk with him.

Foell and his parents went to the local police station, where Foell ultimately confessed to the murder. He was charged with first-degree murder, and an attorney from the local public defender's office was assigned to represent him. The attorney had considerable experience trying felony cases, including murder cases.

Foell filed a pretrial motion to suppress his confession, arguing the police coerced him into making a statement. The trial court held an evidentiary hearing, and denied the motion. Foell's trial on the first-degree murder charge commenced on April 27, 1992. Prior to trial, Foell's attorney filed notice of an intent to assert the defenses of compulsion by duress, and intoxication. Counsel withdrew the compulsion defense at the commencement of the trial, but stated he would still maintain the intoxication defense. *See* Trial Tr. at 12.

During voir dire, the jury was advised that Foell would be offering the defense of intoxication. In the prosecutor's opening statement, he reminded the jury of this fact, and asked them "to pay very close attention to the evidence concerning Mr Foell's behavior prior to the murder, during the murder and following the murder," indicating the evidence would show Foell had presence of mind and knew what he was doing when he committed the crime. Trial Tr. at 127–28

In defense counsel's opening statement, he told the jury about Foell's theory of defense and the evidence they would hear. Relevant excerpts of his opening statement are as follows:

> David Foell confessed to this deed. He did not confess to the murder in the first degree. David Foell will take this witness stand and he will tell you what he did and he will tell you what he did not do. The evidence in this matter will show that Chris Oltman took a weapon, loaded it and pointed it at his grandmother and that weapon, ladies and gentlemen, is David Foell.

> The planning of this crime was done with Jenny Frank, the 15-year old girl friend of Chris Oltman, Chris Oltman, who's 18 years of age, and Mark Torres, a friend of Mr. Oltman who just turned 18. All of that planning was done on Sunday afternoon when Mr. Foell met Mr. Oltman for the first time and everything was already planned out by Mr. Oltman at that time, planned out by Mr. Oltman and Ms. Frank that they would take someone and they'd get them drunk with the intention of having them go kill Chris's grandmother but when they got this person drunk, they didn't tell that person that's what they were going to do. If they had asked Dave Foell in a sober state will you go kill my grandmother, he would have said no.

> Mark Torres and Dave Foell sat in the back of Chris Oltman's car driving around Sunday night. Mark Foell—or, excuse me, Mark Torres by prearrangement was getting Dave Foell drunk in the backseat. Dave and Mark were sitting in the back drinking. Mark was getting him drunk on purpose by prearrangement with Chris Oltman. Was Chris Oltman drinking? No. Was Jenny Frank drinking? No. They were sitting in the front seat. They were the brains of this operation and they had to keep a clear head.

> . . . . .

> Ladies and gentlemen, the evidence will show that this was not planning by my client, Dave Foell. When they

were in the back of the car and Dave was getting drunker and drunker and drunker, it first started out that Mark Torres was going to do this. Mark Torres was going to kill Chris'[s] grandmother. Then after Dave was more drunk, it was Mark was going to do it and Dave was going to help. Then after Dave got drunker and drunker, it was Dave was going to do it and Mark was going to help. Then they were going to have to drop off Mark Torres because he has curfew to make. They dropped him off and there was never any intention of picking him back up. Intention was that Chris was going to drive Dave Foell, the dupe, to Sheffield and then Chris was going to be able to escape any responsibility for this.

. . . . .

When you've heard all of the evidence and listened to it and gone back into the jury room, I believe that you will conclude that David Foell is guilty of murder in the second degree, not murder in the first degree. The planning and premeditation belongs to but one man and one girl and that's Mr. Oltman and Ms. Frank. My client has to bear responsibility for what he did and he will. . . . He will tell you the truth. He will take responsibility for what he did but in the situation he was the dupe. He's the patsy. Chris Oltman is the one that should bear full responsibility here and first degree murder because, again, he took that weapon. He loaded it and he pointed it at his grandmother.

I believe that's what the evidence will show.

(Trial Tr. at 138–22)

Foell's attorney called thirty-five witnesses to testify on Foell's behalf at the trial. Through these witnesses, Foell's counsel elicited testimony to show the murder plan had been concocted by Oltman and Frank, Foell did not participate in planning the murder, and Foell was not known to be someone who would commit a murder unless he was drunk.

Foell also testified in his own behalf at the trial. His account of the events was substantially similar to his attorney's description during opening statement. He also testified briefly about his problems with alcohol abuse as a teenager and an adult. He admitted he committed the murder, but testified that he was drunk, and he was afraid Oltman would hurt him if he did not comply with Oltman's directions to kill Ms. Atkinson. In support of Foell's claim that he was drunk at the time of the murder, his attorney elicited testimony from several witnesses, summarized below.

Lori Portis, a cousin of Jennifer Frank's, testified she called Jennifer after the murder and asked her what happened. She stated Jennifer told her Oltman had paid Foell $6,000 "and got him drunk and took him up to the house, showed him how to get into the garage and where the knives were and that he was suppose[d] to kill her. . . ." Trial Tr. at 617. She testified that she used to hang around with Foell and if he was drinking, it was easy to take advantage of him. Trial Tr. at 619–20.

Yvette Green testified she knew Foell, but not well. From her testimony, it appears her son Anthony was friends with Foell. Green testified Foell came to her house the morning after the murder and wanted to talk to Anthony. She smelled alcohol on Foell. Trial Tr. at 630. Anthony Green also testified that Foell smelled like alcohol. However, Green stated he is familiar with how Foell behaves when he is drunk, and

Foell "didn't really act like he was drunk or anything." Trial Tr. at 638.

William Basler, an investigator for the Iowa Division of Criminal Investigation, testified regarding his investigation of the case, including interviews with Oltman. According to Basler, Oltman confirmed that Foell had bought four quarts of beer on their first trip to Sheffield. (Trial Tr. at 668–69)

Keith Wade Dickerson testified he came to know Foell quite well during November or December of 1990, when Foell was a student at Teen Challenge, where Dickerson works as a teacher and counsel. He explained Teen Challenge is "a Christian discipleship program known primarily for drugs and alcohol rehabilitation." Trial Tr. at 743. He stated Foell "had a history of alcohol abuse and ... could be impulsive and unpredictable in his behavior at times." Trial Tr. at 744. According to Dickerson, Foell's "primary presenting problem at Teen Challenge was his alcohol and his abuse of alcohol and unsocial behavior while under the influence of alcohol." Trial Tr. at 744–45. Dickerson also stated Foell was influenced easily, "very vulnerable to the suggestions of his peers," and "very likely to go along with whatever was suggested in order to gain their approval." Trial Tr. at 745. Dickerson opined Foell would not commit a murder if he was not drinking. He stated Foell behaved fairly normally when he was sober, "but when he would get under the influence of alcohol, he would say and do things that were very abnormal, which is not unusual for someone under the influence of alcohol. [Foell] just seemed to have a much more serious response to that influence than most people do." *Id.* He further opined that Foell "had a much greater problem with being influenced

by people" than other people do. Trial Tr. at 746.

On cross-examination of the State's rebuttal witness, Lesley Abernathy, Foell's attorney elicited testimony that Abernathy had seen Foell, Torres, and Oltman drinking around 10:00 p.m. on Sunday, December 8, 1991. She saw them bring in several quart bottles of beer, but she was unable to say how much Foell drank. When she saw him the next morning, he did not appear to be drunk. Trial Tr. at 757–60. Foell offered no expert testimony to support an intoxication defense, nor did he offer evidence about Fetal Alcohol Syndrome. During a conference in chambers to discuss jury instructions, Foell's attorney stated as follows regarding his theory of defense:

> I would like to state for the record[,] as I have previously informed the Court upon the record, it has been the Defendant's theory of defense from the beginning of this case that the Defendant was guilty of murder in the second degree but not murder in the first degree. The Defendant has voluntarily participated in that theory of defense. It was a theory of defense that he concurred with. For that reason, I am not requesting any lesser included offenses other than murder first, murder second, not guilty.

Trial Tr. at 763. The trial judge reviewed the elements of the lesser included offenses and found there was no factual basis to support submitting the lesser included offenses of voluntary manslaughter, involuntary manslaughter, unintentionally causing a death by an offense other than a forcible felony, or accidentally causing a death. Foell's attorney then stated as follows:

> Just in regard to the lesser included offenses and the record the Court has

just made. I would for the record state that I've reviewed those matters with my client prior to the decision being made of going for the murder second … and I did review with him the arguments that could be made in his—on his behalf in support of lesser included and would state that we would waive any of those arguments.

Trial Tr. at 766.

The prosecutor sought to clarify the defense theory for the record, and asked the following question of Foell's attorney:

MR. MILLER: Just so the record's clear. It is my understanding, correct, counsel, that defense feels it's a matter of trial tactics that whether there are additional lesser included that would meet the *Jeffries* test or not, the defense feels that its chances of avoiding first degree murder verdict and the serious penal consequences that go with that could be enhanced by submitting only first and second degree murder rather than additional lesser included as trial tactic? It's felt that might be defense's advantage in this trial fashion?

Trial Tr. at 766–67. Foell's attorney replied, "That is correct, Mr. Miller." Trial Tr. at 767.

During closing argument, the prosecutor discussed Foell's intoxication defense, as follows:

Now, the defense, I believe, is going to ask you to consider [the] question of intoxication and your instructions will tell you that intoxication can be something that could negate specific intent. So here again, I think specific intent is the real question here. This is where everything comes together because the intoxication instruction relates only to that element.

Let's talk about the evidence that relates to the question of intoxication. The first beer that was consumed, if I recall the testimony correctly, was purchased at Sheffield on Sunday evening when Mr. Foell and the others went down there to case out, if you will, Marian Atkinson's home. These people, and Mr. Foell more particularly, already knew what was going to happen before any beer was drank [sic]. There was a plan and that plan was to kill Chris Oltman's grandmother.

You heard from Officer Reindl who saw Mr. Foell a couple of hours ahead of the time Mrs. Atkinson was killed. He was in close proximity of Mr. Foell. He gave him a ride in his car. He talked with him. He's a police officer who's trained in looking for just that kind of thing and he told you that given the time of day he was suspicious and he did not observe any signs of intoxication.

You heard from Wayne Broome. He talked with Mr. Foell on the phone. He said Mr. Foell didn't sound intoxicated. Mr. Foell told him I have to get to Sheffield. He knew what he was doing.

Dean Porter, the wrecker driver, much like Officer Reindl[,] was in close proximity to Mr. Foell even as late as an hour before the murder was committed. No signs of intoxication.

Then you have Mr. Foell following Chris Oltman's instructions to the letter. Finds his own way to the house, goes in the door like he was told, even has the frame of mind to, in his own words, pick out the biggest knife, followed the instructions to the letter. He returned to the car, had the presence of mind to remember that his glasses had been knocked off and he

had the presence of mind to think that might be important. So he went back to the crime scene, went back into the house where he had killed this woman to retrieve his glasses and to go through the closet to try to find some money. He knew what he was doing. These are not—not the actions of a man who was so intoxicated that he didn't know what he was doing. Then he goes to Tammy Scott's house, lies to her about where he had been. He had the presence of mind to tell her something that would help cover his tracks and cleans off his clothing.

Miss Scott testified she didn't see any signs of him not knowing what he was doing or any difficulty in talking, walking, speaking and this was at about 5:00 in the morning, just an hour or so after the murder was committed.

Danielle Willson, a waitress from Perkins, she didn't see any signs of intoxication.

And, finally, Mr. Foell has some pretty vivid recall about what he did in that bedroom that night. He remembered how he held the knife. He remembered how she was laying on the bed. The only evidence that you have before you that would indicate Mr. Foell—would indicate Mr. Foell may have been intoxicated is his own testimony and, frankly, I don't think his own testimony even supports his theory that he was intoxicated but you have to consider the source. Mr. Foell is a desperate man and his claim of intoxication is simply an act of desperation. His actions speak louder than his words. He did not act like a person who did not know what they were doing on December 8 and December 9, 1991.

Trial Tr. at 774–78.

Foell's attorney focused his closing argument on Foell's lack of premeditation, arguing at length that Oltman and Frank planned the murder. He referred to the intoxication defense briefly on three occasions during his argument. First, he noted the medical examiner had testified the number and depth of stab wounds indicated this was a murder involving "high emotion." Foell's attorney argued to the jury as follows: "You have to determine whether that high emotion was because [Foell] was going to get money. You have to determine whether that high emotion was because of some effect Chris Oltman was having upon Dave Foell or you have to determine whether that was just because Dave Foell had been drinking combined with all these other factors." Trial Tr. at 784.

A short time later, he argued Oltman had to find someone to kill his grandmother before she had a chance to cut him out of her will, and "Dave Foell was the fall guy. Dave Foell was the person that he got drunk and they got him drunk—They didn't tell him they were going to have him go do this. They got him drunk with the intent of having him go do this terrible, terrible act." Trial Tr. at 785.

Finally, at the end of his argument, Foell's attorney argued, "Chris Oltman took a weapon and shot his grandmother and I told you that weapon was David Foell[.] ... Chris Oltman took that weapon. He loaded it. He intoxicated Dave Foell. He got Dave Foell to the point where he thought Dave would do what he wanted him to do. He pointed Dave Foell in the direction of his grandmother and now Marian Atkinson is dead." Trial Tr. at 788–89. Foell's attorney urged the jury to find Foell

guilty of second-degree murder, rather than first-degree murder.

In rebuttal, the prosecution brought up the intoxication defense again. The prosecutor first argued Foell "is a person who is given to impulsive behavior, antisocial behavior and inappropriate behavior, and maybe when he's had a couple drinks is a little bit better able to release those criminal impulses." Trial Tr. at 797. A moment later, the prosecutor argued as follows:

I guess I'm a little confused. The claim of intoxication[,] which is what I thought the defense was initially claiming[,] now is one of premeditation but don't be confused. They're two separate issues. Please recall that the Court has instructed you intoxication does not excuse and does not even affect the degree of guilt unless a person[,] by virtue of intoxication[,] is incapable of forming a specific intent[,] if the intoxication is such that the person suffers from a mental disorder that prevents them from even forming a specific intent. Whether he had a few beers or not that night is totally beside the point. The fact of the matter is[,] and by his own admission[,] he knew what he was doing, was aware of what he was doing and did so with a specific purpose, that of taking a human life.

Trial Tr. at 798.

After forty-eight minutes of deliberation, the jury found Foell guilty of first-degree murder.

Report and Recommendation, Doc. No. 19, at 2–15. Upon review of the record, the court adopts all of Judge Zoss's factual findings that have not been objected to by Foell. Foell's objections to specific factual findings, or omissions, in the report and recommendation will be dealt with in detail below.

## C. Decisions Below

### 1. Direct appeal

Foell appealed his conviction of first-degree murder on the grounds that "1) the district court erred in overruling his motion to suppress incriminating statements he made at the police station; and 2) he was denied effective assistance of counsel." *State v. Foell,* 512 N.W.2d 809, 810 (Iowa Ct.App.1993). The Iowa Court of Appeals affirmed with regard to the district court's overruling of Foell's motion to suppress, finding that (1) no *Miranda* warnings needed to be given as no arrest or custody occurred; (2) Foell voluntarily, knowingly and intelligently waived his *Miranda* rights; and (3) under the totality of the circumstances Foell's statements were voluntarily made and were free from coercion. *Id.* at 812–13.

Foell also claimed that his trial counsel was ineffective for: (1) failing to aggressively argue Foell's motion to suppress; (2) withdrawing Foell's compulsion defense before the start of the jury trial; (3) calling Christopher Oltman, and the DCI agent that questioned Oltman, as defense witnesses; and (4) failing to call witnesses from South Dakota that would have testified that Foell suffered from Fetal Alcohol Syndrome ("FAS"). *Id.* at 813–14. The Iowa Court of Appeals found that trial counsel acted reasonably in all regards, and that his strategy decisions were within the normal range of professional competency. *Id.* Further, the court held that Foell could not show that he was prejudiced by his trial counsel's alleged breaches of duty:

The evidence of Foell's guilt was overwhelming. The State introduced into evidence Foell's confession and the testimony of Oltman's girlfriend, who was granted immunity. Foell himself testified he intended to kill the victim when

he entered her house. He also stated he was fully aware he was killing the victim when he repeatedly stabbed her.

We are unable to say, but for the alleged errors committed by his trial counsel, the jury would not have convicted Foell of first-degree murder.

*Id.* at 814. Ultimately, Foell's conviction was affirmed. *Id.*

### 2. Post-conviction relief application hearing

After being denied relief on direct appeal, Foell filed a post-conviction relief application in which Foell essentially contended that trial counsel was ineffective for failing to raise the fact that Foell suffered from FAS at either the hearing on the motion to suppress Foell's incriminating statements or as part of a defense at Foell's trial, and that counsel was ineffective in his determination to call Foell as a witness in his own defense. *Foell v. State,* No. PCCV002644, "Findings of Fact, Conclusions of Law, and Ruling" (Franklin County District Court Aug. 11, 2000) ("PCR Ruling") (Doc. No. 12). The post-conviction relief ("PCR") court found that Foell's trial counsel, Mr. Byrne, conducted a reasonable investigation into the possibility of using FAS by: (1) acquiring records from Foell's prior substance abuse treatment; (2) discussing the possibility of using FAS with psychiatrist Dr. Larsen— who believed FAS would not be a defense; (3) consulting psychiatrist Dr. Roberts— who also rejected FAS as a theory of defense for Foell; (4) researching the use of FAS as a defense in published cases— with no success; and (5) contacting an attorney at the Public Defender's Office in Rapid City, South Dakota, an area of high Native American concentration—to find that he had no success using FAS as a defense. In light of this adequate investigation, coupled with the Foell family's express wish that information in the psy-

chologist reports regarding Foell's sexual relationship with his adoptive father never be made public, as well as the fact that Foell had not presented testimony from a medical expert regarding FAS at the PCR hearing, the PCR court concluded that Mr. Byrne had not provided Foell with ineffective assistance of counsel. Further, the PCR court found that Foell could not show a reasonable probability that, absent the alleged mishandling of his case, the jury would have returned a verdict of second-degree murder rather than first-degree murder. Ultimately, the court denied Foell's application for post-conviction relief.

### 3. Appeal of denial of post-conviction relief application

Foell appealed the denial of his post-conviction relief application to the Iowa Court of Appeals. *Foell v. State,* No. 00–1536, 2001 WL 1658885 (Iowa App. Dec.28, 2001). On appeal Foell urged that Mr. Byrne was ineffective by: (1) "calling [Foell] as a witness to generate sympathy and then arguing to the jury that he was a tool in Oltman's hands because both the strategy and the argument had no legal basis"; and (2) "failing to introduce evidence that he suffers from fetal alcohol syndrome and other mental deficiencies contending that this evidence would have resulted in his confession being suppressed and would have shown he did not form the specific intent to kill necessary for the first degree murder conviction." *Id.* at *1. As to Foell's first contention, the Iowa Court of Appeals determined that:

Even if Foell's trial counsel's performance was deficient as Foell argues, and we need not decide that it was, Foell cannot show he was prejudiced. The argument that Foell was only guilty of second degree murder was well developed and presented by his trial attorney.

*Id.* at \*3. As to Foell's second contention, that Mr. Byrne was ineffective for failing to introduce evidence that Foell suffered from FAS at both the suppression hearing or at the trial, the court concluded:

> Foell has failed to show that advancing [an FAS argument] at the time of the suppression hearing would have resulted in the suppression of Foell's confession. . . .
>
> Nor has Foell shown that his attorney did not adequately perform in addressing the issue at trial. Foell's trial attorney did substantial research before trial and found no case where the syndrome had been successfully raised as a defense. The decision not to attempt to introduce such evidence was a strategic decision.
>
> Foell has failed to show that additional evidence as to his psychological characteristics would have changed the results of the trial. As this court found on direct appeal, the evidence of Foell's guilt was overwhelming. *Foell,* 512 N.W.2d at 814.

*Id.* Ultimately, the Iowa Court of Appeals affirmed the denial of post-conviction relief. *Id.*

## II. LEGAL ANALYSIS

### A. Standard Of Review

Pursuant to statute, this court's standard of review for a magistrate judge's report and recommendation is as follows:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). Similarly, Federal Rule of Civil Procedure 72(b) provides for review of a magistrate judge's report and recommendation on dispositive motions and prisoner petitions, where objections are made, as follows:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

FED. R. CIV. P. 72(b).

■ The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose,* 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied,* 519 U.S. 860, 117 S.Ct. 164, 136 L.Ed.2d 107 (1996); *Grinder v. Gammon,* 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett,* 15 F.3d 803, 815 (8th Cir.1994)); *Hudson v. Gammon,* 46 F.3d 785, 786 (8th Cir.1995) (also citing *Belk* ). Because objections have been filed in this case to Judge Zoss's legal conclusions, the court must conduct a *de novo* review.

### B. Objections To Findings of Fact

#### 1. Timeliness and content of reports on petitioner's mental condition

Foell first objects to the omission in Judge Zoss's factual findings of particularized information found in the reports of psychiatric health care workers who examined Mr. him. Additionally, in tandem with this objection, Foell objects to the omission in Judge Zoss's factual findings of the correlation between the availability of these reports to trial counsel and the

dates surrounding the motion to suppress Foell's incriminating statements to police, as well as the date the jury trial was to start. In the interest of efficiency and organization—rather than reiterate the details as laid out in Foell's objections—the court will summarize the details Foell contends are contained in each of the reports, but are allegedly omitted from the report and recommendation, and then determine the status of Foell's objections. Following this summary, the court will clarify the relevant dates concerning the availability of these reports to trial counsel at key times in the criminal proceedings.

### a. Report of psychiatric social worker Jim Anderson

Mr. Jim Anderson, a court appointed psychiatric social worker, prepared a report dated April 10, 1992, following an interview of Foell that Mr. Anderson co-conducted with psychiatrist Dr. Greg Roberts. Plaintiff's Appendix on Appeal From the Franklin County District Court (Plf.'s App.) at 337–38. The purpose of the interview was twofold: (1) to discuss the sexual contact Foell had with his father; and (2) to discuss the alleged murder. *Id.* at 337. With regard to the details of the murder, the report indicates, as petitioner contends, that (1) Foell felt pressured, coerced and scared of Chris Oltman on that night; (2) Oltman and Jenny Frank talked Foell into getting drunk that night; (3) Foell consumed between 2–4 quarts of beer between 8:00 p.m. and the time of stabbing at 3:30 a.m.; (4) Foell stabbed the victim until she stopped speaking; and (5) Foell stated that he did not intend to kill the victim and felt remorseful for his actions. *Id.* at 337–38. Despite Foell's assertions, the report does *not* state that Foell had an I.Q. of 74, or that he felt the effects of the alcohol he consumed at the time of the killing. The report *does* indicate that Foell told the psychiatrist he was "shaking and scared all the time he was [stabbing the victim]" and that he has a "major problem with alcohol which seemed to cloud his mind and interfere with his decision making." *Id.* at 338. As noted, the report supports some, but not all, of Foells objections and therefore Foell's objections as to the omission of content from Mr. Anderson's report in Judge Zoss's Report and Recommendation are granted in part and denied in part.

### b. Report of psychiatrist Dr. Greg Roberts

Dr. Greg Roberts, a psychiatrist, prepared a report dated April 14, 1992, and addressed to Foell's trial counsel, Mr. Byrne, following his evaluation of Foell on April 10, 1992. *See id.* at 340–345. Foell objects specifically to the magistrate's omission of the following information contained in Dr. Roberts's report: (1) Foell made the following statements to Dr. Roberts: "I wasn't thinking of the consequences. I was thinking about getting it over and getting back to the car."; (2) Dr. Roberts's report notes that Foell was a chronic alcoholic; (3) Foell told Dr. Roberts that he still hears Ms. Atkinson's voice in his cell at night; and (4) Foell has had a speech problem from an early age. This information is contained in Dr. Roberts's report. *See id.* at 341, 343. Therefore, as to these facts, Foell's objection is granted.

### c. Report of psychologist Kenneth P. Schmitz

A report dated April 16, 1992, was composed by psychologist Kenneth P. Schmitz following his April 10, 1992, evaluation of Foell. Foell objects to the omission, in Judge Zoss's factual findings, of numerous aspects of Mr. Schmitz's report—including particular results of several of the tests conducted by Mr. Schmitz. The court will

try to compartmentalize the facts Foell requests to be included. Foell objects to the omission of the following general statements from the report: (1) Mr. Schmitz administered five tests[3] during his evaluation of Foell; (2) the report concluded that Foell operates at a lower level of intellectual ability; (3) Foell has an I.Q. of 74; (4) Foell was in special education classes at school; (5) Foell chronically abused alcohol, on some occasions until he blacked out; and (6) Foell was in a chemical dependency treatment program in December 1991, when the offense occurred. All of these general assertions are found in Mr. Schmitz's report, except the statement that Foell was in a chemical dependency program at the time of the crime. The report states only that: "[Foell] did have some chemical dependency treatment in December of 1991." *Id.* at 348. It is unclear whether this treatment was occurring before, during, or after the crime was committed. As the report supports some, but not all, of Foell's objections to the omission of these general facts found in Mr. Schmitz's report, Foell's objections are granted in part and denied in part accordingly.

Next, Foell challenges the omission of the specific results of the various psychological tests Mr. Schmitz conducted on Foell, namely the following:

1. Two of the Minnesota Multiphasic Personality Inventory (MMPI) scales showed a marked elevation on two scales—of which 68% of individuals who obtain similar elevations are psychotic and 14% of individuals with similar elevations have organic brain disorders.

2. Based on the results of all of the tests conducted Mr. Schmitz did not believe Foell was psychotic.

3. Mr. Schmitz concluded that Foell did not have an organic brain condition based on the results of the Bender Gestalt test, though the Bender Gestalt test results were indicative of some constriction.

4. Mr. Schmitz concluded, based on the test results, that Foell did not suffer from an organic brain condition,[4] but rather a personality disorder.

5. Persons with personality disorders think in unusual and unconventional ways, are often unpredictable and emotionally inappropriate, and in some instances have histories of aggressive attacks following periods of drinking.

Petitioner's Objections to Magistrate's Report and Recommendations ("Pet.Obj."), Doc. No. 20, at 6–7. Mr. Schmitz's report contains this information (except for the footnoted matter) and is a part of the record. Therefore Foell's objections to the omission of the specific results of Mr. Schmitz's report are granted.

---

3. The tests administered were the following: Wechsler Adult Intelligence Scale—Revised; Bender Gestalt; Person drawing; Minnesota Multiphasic Personality Inventory; Rorschach. Plf.'s App. at 346.

4. Foell's objections state that, of persons who test similarly to himself, 86% suffer from an organic brain condition. This factual assertion is *not* contained in Mr. Schmitz's report—the report only states that "68% of the individuals who obtain this profile are diagnosed as psychotic, however, that is not applicable to David because his reality functioning is not in question." *Id.* at 349. The report does not explicitly state that psychotic persons have an organic brain condition, and the 86% figure is not contained anywhere in the report—the court recognizes that this could just be a transposition error, but regardless of its origination, it is an incorrect statement of the content of Mr. Schmitz's report.

#### d. Letter from Dr. Roberts to Mr. Byrne

Foell objects to the exclusion of any discussion surrounding a "report" dated April 24, 2001, that he claims relates specifically to FAS. With regard to this "report," Foell makes the following assertions:

> Defense counsel also received a report specifically pertaining to fetal alcohol syndrome. This report was dated April 24, 1992.... The report assumed that Foell suffered from fetal alcohol syndrome, but it concluded that this would not provide the basis for a complete defense to the charge. [PCR Trial, Exhibit F; Appendix, page 339]. The report, however did not discuss whether the condition would support a partial defense, i.e. diminished responsibility which would bear on the degree of the offense.

Pet. Obj. at 7–8. In describing this correspondence, Foell makes a number of mischaracterizations. First, the document in question was not a report, but rather a letter from Dr. Roberts to trial counsel, Mr. Byrne, after conversations Dr. Roberts had with Foell's mother on April 22, 1992, and with Mr. Byrne on April 23, 1992. Specifically, the letter states it is to provide Mr. Byrne with information on FAS and with Dr. Roberts's opinion as to whether FAS could assist in Foell's defense. Plf.'s App. at 339. Second, Foell asserts that Dr. Roberts assumed Foell suffered from FAS in phrasing his opinion expressed in the letter. It is an extremely tenuous assertion that the letter *assumes* Foell suffers from FAS—Dr. Roberts never once explicitly states that his statements are premised on an assumption that Foell suffers from FAS. Therefore, the categorization of the letter as a "report" and the assertion that Dr Roberts assumes Foell suffers from FAS in reaching his

opinion are conclusions too tenuous to determine to a factual certainty. With regard to these matters, Foell's objections are denied.

Additionally, Foell objects to some other factual matters which, in fact, are included in Dr. Roberts's letter. Dr. Roberts does state that FAS, "in and of itself, is not something that [he] could argue would take responsibility off the shoulders of David Foell" and that "it has been [his] experience that this syndrome would in no way take the onus of responsibility off individuals in criminal cases with the mental status that David Foell presents with." *Id.* The letter also does not, as petitioner points out, discuss FAS as a partial defense. With respect to these asserted facts, Foell's objection is granted.

#### e. Timeline

With regard to mental evaluation reports, Foell next objects to the fact that Judge Zoss's Report and Recommendation did not illustrate the sequence of events surrounding the availability, or unavailability, of the information in the reports to trial counsel. The court will give a brief time-line of the relevant dates that Foell seeks to have highlighted.

- April 6, 1992—Motion to suppress filed.
- April 10, 1992—Date of Mr. Anderson's report.
- April 14, 1992—Date of Dr. Roberts's report.
- April 16, 1992—Hearing on motion to suppress.
- April 16, 1992—Date of Mr. Schmitz's report.
- April 24, 1992—Date of letter from Dr. Roberts regarding possible role of FAS.
- April 27, 1992—Jury trial of Mr. Foell commenced.

All of these events occurred on the dates alleged by Foell in his objection, therefore, in this regard, Foell's objection is granted.

### 2. Factual finding of intent to kill by state court

Foell's next objection centers on a written finding by the Iowa Court of Appeals on direct appeal,[5] which was cited by Judge Zoss in his Report and Recommendation, that when Mr. Foell testified at trial he admitted that he intended to kill the victim and that he was fully aware that he was killing the victim when he stabbed her. Specifically, Foell objects to the following finding:

> Foell himself testified he intended to kill the victim when he entered her house. He also stated he was fully aware he was killing the victim when he repeatedly stabbed her.

*State v. Foell,* 512 N.W.2d 809, 814 (Iowa App.1993); *see also* Report and Recommendation at 16. Foell contends that his testimony at trial did not amount to an admission of his intent to kill Ms. Atkinson and, rather, was ambiguous at best. In support of his contention that his testimony was ambiguous as to whether or not he intended to kill his victim, Foell points to this excerpt of his trial testimony on cross-examination:

Q: Well, you were sober enough to know that you were taking a human life; isn't that right?

A: No, I wasn't.

Q: Mr. Foell, you've already told us that you knew that was a butcher knife in your hand? That's true, isn't it?

A: Well, I was drunk, yes.

Q: Mr. Foell, did you know that was a butcher knife that you were holding?

A: Yes.

Q: Or didn't you?

A: Yes, I did.

Q: And you knew that you were swinging that butcher knife at this woman, didn't you?

A: Yes.

Q: And you knew that she was dying as you did that, didn't you Mr. Foell?

A: Yes, but then I left.

Q: *Because you kept swinging the butcher knife until she was dead; isn't that right, Mr. Foell?*

A: **No. I just left after I did that**

\*　　\*　　\*　　\*　　\*　　\*

Q: *Mr. Foell, isn't it true that Marian Atkinson was dead when you walked out that door?*

A: **I ran out.**

Q: *Marian Atkinson was no longer moving? She was lying in a pool of blood on her bed when you walked out of that room; isn't that right Mr. Foell?*

A: **I didn't look at her, if that's what you're saying. I didn't know.**

Pet. Obj. at 8–9 (quoting Trial Tr. 585–86)(emphasis added in Pet. Obj. not in original).

 In examining petitions for writs of habeas corpus arising under 28 U.S.C. § 2254 the factual findings of state courts are accorded a presumption of correctness. *See, e.g., Robinson v. LaFleur,* 225 F.3d 950, 953 (8th Cir.2000) ("We presume the state court's factual findings to be correct; ....."); *Owens v. Dormire,* 198 F.3d 679, 682 (8th Cir.1999) ("State court findings of fact are entitled to a presumption of correctness.") (citing 28 U.S.C. § 2254(e)(1)

---

5. Foell contends that this contested factual finding was made by the post-conviction relief judge, but cites to page 15 of Judge Zoss's Report and Recommendation—which quotes the Iowa Court of Appeal's decision on direct appeal, not the PCR Opinion. This court will therefore treat Foell's objection to the Iowa Court of Appeal's finding on direct appeal.

(Supp. III 1997)); *Brown v. Caspari*, 186 F.3d 1011, 1014 (8th Cir.1999) (same). The presumption of correctness applies with equal force to the findings of both trial and appellate courts. *See Perry v. Kemna*, 356 F.3d 880, 883 (8th Cir.2004) (noting that the "presumption of correctness applies to factual determinations made by state courts, whether the court be a trial court or an appellate court.") (quoting *King v. Bowersox*, 291 F.3d 539, 540 (8th Cir.2002)); *Tunstall v. Hopkins*, 306 F.3d 601, 605 (8th Cir.2002) (noting that the presumption of correctness applies to all factual determinations by both trial and appellate courts at the state level); *Flieger v. Delo*, 16 F.3d 878, 886 (8th Cir.1994) ("factual findings of state courts, both trial and appellate, are presumed ... to be correct. ...") (citations omitted). Foell has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Robinson*, 225 F.3d at 953; *Culkin v. Purkett*, 45 F.3d 1229, 1232 (8th Cir.1995).

■ The excerpt of Foell's testimony on cross-examination that Foell points to in support of his objection does exhibit some ambiguity as to his intent when he entered Ms. Atkinson's home. However, there are many other excerpts of Foell's trial testimony in which Foell unambiguously states that he intended to kill his victim. For example:

Q: Well, why did you get out of the car, Mr. Foell?

A: To go to the house.

Q: To do what?

A: To kill his grandmother.

Trial Tr. at 563.

Q: So as you walked toward Marian Atkinson's backdoor, you were walking there on a mission to take her life; isn't that right, Mr. Foell?

A: Yes.

Trial Tr. at 568.

Q: Then you walked through that door into the home of Marian Atkinson, didn't you?

A: Yes.

Q: To do what?

A: To go kill Chris' grandma.

Trial Tr. at 571.

Q: And you knew that you were going to use [the butcher knife] to kill Chris' grandmother; isn't that right?

A: Yes.

Trial Tr. at 576.

Q: And as you repeatedly plunged that knife into her body, you knew that she was dying, didn't you?

A: No, I didn't. Yes, I guess I did. Yeah.

Q: You knew that her death would result from that stabbing, didn't you Mr. Foell?

A: Yes.

Trial Tr. at 599. Further, during the trial on his post-conviction relief application Foell testified as to *why* he "mistakenly" testified at trial that he intended to kill his victim:

Q: Well, except I think you did tell the jury that you did go to her room for the purpose of killing her.

A: Right, but I didn't—

Q: Did you actually go to the room for the purpose of killing her?

A: No.

Q: *Why did you tell the jury that you did?*

A: Because in the state of mind I was, I wasn't thinking when I said what I said because the state of mind that I wasn't mentally prepared, mentally, physically ready to make those kinds of decisions because—and the choices which I made was incorrect and I regret

making the choice what I said to the jury. Because when I said it, I wasn't think (sic) the whole question through when I said it.

PCR Tr. at 65–66 (emphasis added).

There was clearly a basis for the Iowa Court of Appeals's determination that Foell testified at trial that he intended to kill Ms. Atkinson when he entered her home, took out the butcher knife, and went up to her room. Though Foell has pointed to some excerpts of his trial testimony that are ambiguous as to his intent, this alone cannot carry his burden of establishing by clear and convincing evidence that the factual finding by the Iowa Court of Appeals on direct review was incorrect. Therefore, Foell's objection to this factual finding by the Iowa Court of Appeals, as cited in Judge Zoss's Report and Recommendation, is denied.

### 3. Evidence that could have bolstered an intoxication defense

Next, Foell objects to the fact that Judge Zoss's Report and Recommendation did not contain all the circumstances attendant to trial counsel's decision "to present a free-standing intoxication defense not bolstered by evidence of Mr. Foell's general mental limitations and characteristics." Pet. Obj. at 9. Particularly, Foell seems to object to the fact that the report and recommendation did not include the fact that, early in the life of the case, Foell's mother advised trial counsel that Foell displayed symptoms associated with FAS, that Foell was of American Indian descent, and that Foell's biological mother drank heavily while she was pregnant. Moreover, Foell objects to the omission of the fact that trial counsel told Foell's mother that he would withdraw as Foell's attorney if she insisted that he present evidence relating to FAS.

At the trial on Foell's post-conviction relief application, Foell's mother, Ms. Irma Foell, did testify to the following: (1) Foell is of Native American descent; (2) Foell's biological mother drank excessively while pregnant; (3) Ms. Foell told trial counsel that FAS could be a good defense for her son; (4) Trial counsel told Ms. Foell that he would not present FAS as a defense; and (5) Ms. Foell could not afford to pay for a non-court appointed attorney for her son. PCR Tr. at 15–16, 28. Trial counsel did testify that he researched the possibility of presenting FAS as a defense by searching for published cases in which FAS was similarly used, by contacting an attorney in a geographical area which contained a high density of Native American persons about the prospect of using FAS as a defense, and by discussing the use of FAS as a defense with Dr. Roberts and Mr. Schmitz. PCR Tr. at 92–94. At no point did trial counsel testify that he told Ms. Foell he would withdraw as her son's attorney if she continued to insist on using FAS as a part of the defense. As the factual assertions attributable to Ms. Foell's PCR testimony are in fact in the record, and are not included in Judge Zoss's Report and Recommendation, Foell's objection is granted.

### 4. Counsel's reasons for calling petitioner as a witness at trial

Foell's final factual objection is to the omission of the circumstances surrounding trial counsel's decision to have Foell testify in his own defense. Specifically, Foell appears to object to the omission of trial counsel's reasons for putting Foell on the stand in his own defense—namely, that trial counsel felt that there was nothing to lose by placing Foell on the stand, hoped that the jurors would feel sympathy for Foell, and hence sought jury nullification. At the hearing on Foell's post-conviction relief application, his trial counsel testified

regarding his reasons for putting Foell on the stand in his own defense:

Q: What were you hoping to gain by his testimony?

A: I was hoping that a jury, to the extent that it was possible, would like David and that they would see David as he was, in the state of being able to be manipulated by Mr. Oltman and Ms. Frank, hoping that if they could see, you know, what I could see, that they would return a verdict of Second Degree Murder.

\* \* \* \* \* \*

Q: Did you feel like you had anything to lose?

A: That's really what it boiled down as far as his testimony. I told him that he really didn't have anything to lose [in light of th evidence against him]. What he had to gain was that he would be able to stick to our prepared trial testimony and that, you know, the hope was for a second degree verdict.

PCR Tr. at 99–100. It is clear that Mr. Byrne placed Mr. Foell on the stand because he felt Foell had nothing to lose, and he thought that placing him on the stand would exhibit to the jury how easily he could be manipulated by others. In these respects, Foell's objection is granted. However, Mr. Byrne at no point testified that his strategy in placing Foell on the stand was aimed at inducing jury nullification—therefore, in this regard the objection is denied.

### C. Objections To Legal Conclusions

### 1. General standards for 2254 relief

██ Section 2254(d)(a) of Title 28, as amended by the Antiterrorism and Effec-

tive Death Penalty Act (AEDPA) of 1996 governs Foell's petition.

Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting 28 U.S.C. § 2254(d)(1)).[6] In this instance Foell seeks habeas relief under the second category. An "unreasonable application" of Federal law by a state court can occur in two ways: (1) where "the state court identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case"; or (2) where "the state court either unreasonably extends a legal principle from [Supreme] Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407, 120 S.Ct. 1495. It is not enough that the state court applied clearly established federal law erroneously or incorrectly—the application must additionally be unreasonable. *Id.* at 411, 120 S.Ct. 1495; *see Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) ("an

---

**6.** Section 2254(d)(2) also allows a writ of habeas corpus to issue if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(2); *see c.f. Sexton v. Kemna*, 278 F.3d 808, 811 (8th Cir.2002). Foell does not seek habeas relief on this ground.

unreasonable application is different from an incorrect one.").

### 2. Standards for ineffective assistance of counsel claims

■■■ The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In the Report and Recommendation, Judge Zoss outlined the two-prong criteria employed in determining the effectiveness of counsel, which was enunciated by the United States Supreme Court in *Strickland.* To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness;" and (2) "the deficient performance prejudiced the defense." *Id.* at 687, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Furnish v. United States of America,* 252 F.3d 950, 951 (8th Cir.2001) (stating that the two-prong test set forth in Strickland requires a showing that (1) counsel was constitutionally deficient in his or her performance and (2) the deficiency materially and adversely prejudiced the outcome of the case); *Garrett v. Dormire,* 237 F.3d 946, 950 (8th Cir.2001). Trial counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Indeed, "counsel must exercise reasonable diligence to produce exculpatory evidence[,] and strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir. 1991). However, there is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy. *Id.* at 689, 104 S.Ct. 2052, 466 U.S. 668, 104 S.Ct.

2052, 80 L.Ed.2d 674; *Collins v. Dormire,* 240 F.3d 724, 727 (8th Cir.2001) (in determining whether counsel's performance was deficient, the court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ...") (citing *Strickland* ). With respect to the "strong presumption" afforded to counsel's performance, the Supreme Court specifically stated:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted).

To demonstrate that counsel's error was prejudicial, thereby satisfying the second prong of the *Strickland* test, a habeas petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The court will now turn to Foell's assertions of error upon which he bases his ineffective assistance of counsel claims, as well as Judge Zoss's conclusions with respect to those claims, followed by this court's analysis of Foell's objections to the legal conclusions reached by Judge Zoss.

### a. Foell's objections

Foell contends that his trial counsel's performance was deficient in a number of ways: (1) failing to conduct a timely investigation of Foell's mental health; (2) failing to appreciate the nature and factual basis for a diminished responsibility defense; (3) failing to make a reasonable choice of defenses, which ultimately resulted in no valid defense; and (4) unreasonably persuading Foell to abandon a mental defense based on FAS. Pet. Obj. at 14–23. Basically, Foell contends that were counsel to have recognized the availability of a diminished responsibility defense and presented the evidence of Foell's mental condition, as well as Foell's mother's anecdotal testimony that Foell suffered from FAS, it would have directly refuted the specific intent element required for a finding of first-degree murder. Foell goes further, stating that the Iowa Court of Appeals unreasonably applied the law by failing to entertain the impact that presenting such a diminished responsibility defense, based on the information available to trial counsel, would have had on the outcome of the trial.

### b. Magistrate's conclusions

In analyzing Foell's ineffective assistance of counsel claims, Judge Zoss agreed with, and deferred greatly to, the *Strickland* analysis employed by the PCR court. Judge Zoss noted that though the defense strategy adopted—that Foell was intoxi-

cated in combination with the fact that he was easily manipulated—was unsuccessful, it was adopted because trial counsel thought it was in his client's best interest. Judge Zoss further noted that trial counsel was placed in an impossible position—Foell confessed to murder, there was overwhelming evidence of Foell's guilt, and despite diligent research counsel could find no basis in law or fact to support a defense based on FAS. Judge Zoss also stated:

> [T]his is not a case where Foell's attorney sat mute and did nothing to represent him. Counsel filed and litigated a pretrial motion to suppress. He participated actively in voir dire. He vigorously cross examined the State's witnesses, and he called thirty-five witnesses to testify on Foell's behalf. He consistently argued Foell was Oltman's patsy, and he elicited testimony to support that defense theory. Although the defense strategy ultimately was not successful, that is not sufficient prejudice to constitute ineffective assistance of counsel. *James v. Iowa,* 100 F.3d 586, 590 (8th Cir.1996) ("Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful.")

Report and Recommendation at 24. As Judge Zoss found that Foell failed to prove prejudice under *Strickland,* he determined that it was unnecessary to rule on whether Foell's trial counsel's performance was ineffective. *Id.* at 24–25. Ultimately Judge Zoss recommended that Foell's § 2254 petition be denied.

### c. Analysis

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances,

applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. In making an assessment of reasonableness, the court looks at the facts of the case "viewed *as of the time of counsel's conduct.*" *Id.* at 690, 104 S.Ct. 2052 (emphasis added). "Counsel's decisions are presumed reasonable and 'strategic choices made after thorough investigation of law and facts ... are virtually unchallengeable.' " *Simmons v. State of Iowa*, 28 F.3d 1478, 1481 (8th Cir.1994) (quoting *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052). In addition to showing unreasonable representation by trial counsel, the defendant must also show that counsel's performance is prejudicial—which translates into showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. In light of these principles the court will now consider each of Foell's objections.

▪ *i. Appreciation of a diminished responsibility defense.* Foell objects to Mr. Byrne's conduct on several grounds, all of which appear to relate to Mr. Byrne's handling of information regarding whether Foell suffered from FAS. Basically, Foell claims that Mr. Byrne failed to appreciate the nature and factual basis for a viable diminished responsibility defense and rather submitted an ill-concocted defense grounded neither in law or in fact.

The record indicates this case is not one in which trial counsel conducted no investigation into Foell's mental health—Mr. Byrne conducted investigations into both Foell's mental health in general and into the propriety of using FAS as a defense. As the factual findings denote, Foell's mental health was examined by three professionals: Mr. Anderson, Dr. Roberts and Mr. Schmitz. As detailed above, Mr. Anderson's report was dated April 10,

1992; Dr. Roberts's was dated April 14, 1992, and Mr. Schmitz's was dated April 16, 1992—these correlate to 17, 13, and 9 days before Foell's jury trial commenced on April 27, 1992. Dr. Roberts's letter advising that FAS would not take the onus of responsibility off Foell was dated April 24, 1992—3 days before trial—though the letter mentions that it is based on a *prior* conversation between Dr. Roberts and Mr. Byrne. The mental health professionals came to the following conclusions regarding Foell's general mental state:

● "In my opinion, it seems that David is a very impulsive young lad but he is capable of making a decision and knowing right from wrong. He showed no signs of any mental illness, ...." Report of Mr. Anderson, Plf.'s App. at 338.

● "There is no suggestion of diminished capacity. Although Mr. Foell has a speech impedient (sic) and is probably of at least low average intellectual capability, he knows the difference between right and wrong and clearly knew it was wrong that he murder Marion Atkinson." Report of Dr. Roberts, Plf.'s App. at 344.

● "David is functioning in the borderline range of intelligence. He's not organic. His reality testing is adequate. He knows right from wrong." Report of Mr. Schmitz, Plf.'s App. at 350.

With regard to research specific to FAS, Mr. Byrne pursued the following courses of action: (1) researched published cases for successful or unsuccessful use of FAS as a defense; (2) contacted attorneys at the Public Defender's Office in Rapid City, South Dakota, an area in which there is a significant Native American population, about their success in using FAS as a defense; (3) talked with local psychiatrist Dr. Larsen about using FAS as a defense; and (4) discussed the possibility of using FAS as a defense with Dr. Roberts. PCR

Tr. at 93–94. All of these researched avenues resulted in the same conclusion: FAS was not a viable defense for Foell. Without the testimony of an expert that FAS would somehow deprive Foell of the specific intent necessary to commit first-degree murder, Mr. Byrne felt that it was not a viable defense to present. PCR Tr. at 95–96 ("I'm not an expert. I can't testify as an expert at a trial. Unless I can find an expert who's willing to testify that Fetal Alcohol Syndrome is a defense, I'm really without any ammunition."). It seems obvious from the state of the facts that Mr. Byrne's decision not to present FAS, standing alone, as a defense was reasonable. Further, the court finds that Mr. Byrne conducted an adequate investigation into Foell's mental state in general, as well as into the possibility of using FAS as a defense—any contention to the contrary is without merit.

 However, this does not appear to be the crux of Foell's objection to the legal conclusions of the Judge Zoss (or of the lower state courts for that matter). Foell's objection is, rather, based on the premise that "available evidence that would have allowed Mr. Foell to mount a [diminished responsibility] defense was not presented to the jury." Basically, Foell argues that Mr. Byrne was ineffective in failing to recognize that evidence of Foell's decreased intelligence from the psychological evaluations, combined with Foell's mother's anecdotal evidence of Foell's possible FAS and other mental defects, would have raised a viable diminished responsibility defense. Foell points to the fact that

the letter written by Dr. Roberts addressing the use of FAS was directed only at using FAS as a total defense, not at using FAS as part of a diminished responsibility defense in conjunction with Foell's intoxication and alleged mental abnormalities—a fact that Foell claims evinces Mr. Byrne's ignorance of the law. Further, Foell points to a void in the record of any statement by Mr. Byrne that he had ever considered a diminished responsibility defense. Foell contends Mr. Byrne's failure to recognize, and pursue, a viable diminished responsibility defense was both unreasonable and prejudicial.

The court is left to evaluate whether Mr. Byrne's failure to propound a defense premised on diminished responsibility amounts to unreasonable representation. To determine whether Foell has raised a viable objection, the court looks to the facts and circumstances at the time of trial and not at the situation from a perfected hindsight perspective. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. First, as discussed above, *all* of the three mental health professionals that evaluated Foell were of the opinion that Foell knew right from wrong at the time of the act, and further, Dr. Roberts opined that, were Foell suffering from FAS, this would not take the onus of responsibility off Foell for the crime committed. Secondly, the reports of the mental health professionals contained information regarding Foell's sexual relationship with his father, Wayne Foell. Specifically, that Wayne would give Foell money to perform various sexual acts with him.[7] The Foell family specifically requested that this information regarding

---

7. With regard to sexual contact between David Foell and his father, the reports of the mental health professions contain the following details:

- Report of Mr. Anderson—With regard to the sexual contact, Mr. Anderson indicates that Foell reported hundreds of instances of sexual contact with his father—ranging from

fondling, mutual masturbation, oral sex and one incident of anal sex. Plf.'s App. at 338. Foell stated that he did these things primarily because his father would give him money after performing these acts—which Foell would use to purchase alcohol. *Id.*

- Report of Dr. Roberts—"[Foell] stated that at age fifteen or sixteen, he is not sure

the sexual nature of Foell and his father's relationship not be made public at trial. Both Foell and Mr. Byrne testified to this effect.[8] Third, Mr. Byrne was aware that were Foell to assert a mental defense such as diminished responsibility the reports generated by the mental health professionals would almost certainly be disclosed to the prosecution and would likely have been made public: [9]

> which, 'my dad put his lips around my penis' for money. He does not remember the exact amount, it was either twenty or thirty dollars. David stated that the first time dad said to him 'do you want to make some money, let's see who can fly the highest'. They both masturbated to see who could ejaculate the furtherest. He states this continued for quite a while and it only stopped when he was sent away to the Christian Camp and recommenced when he returned from the camp. On almost all occasions this was done for money. David used the money to purchase alcoholic beverages." *Id.* at 342.

8. Testimony of Foell:

> Q: Do you recall speaking with Mr. Byrne about information [in Dr. Roberts's report] relating to you father—?
>
> A: M-m h-m.
>
> Q: —Wayne Foell?
>
> A: M-m h-m.
>
> Q: And whether you wanted to avoid any mention of anything that you told Dr. Roberts—
>
> A: M-m h-m.
>
> Q: —because you wanted to, you know, prevent Wayne from being embarrassed or—
>
> A: Yeah.
>
> Q: Right?
>
> A: Yeah . . . .

PCR Tr. at 71–72.

Testimony of Mr. Byrne:

> Q: And there was a decision—a trial strategy to not raise the Fetal Alcohol Syndrome?
>
> A: That was part of it. Another part of it was that if we did proceed with any mental defenses and we were walking a very fine line at trial, Mr. Miller and Mr. Drew, the prosecution would be entitled to a copy of the reports that we had in our possession

I remember discussing with David and Irma and Wayne that David, Irma and Wayne did not want the mental health reports released or this information regarding the relationship between David and his father to be released to the public. I recall advising them that if we did that, that *they would not be able to pursue any other mental health defenses.*

> that had not, I believe, previous to today, been disclosed to the prosecution. And, in fact, Mr. Miller and Mr. Drew could have called Mr. Roberts as a witness against us. In particular, of concern to David and to Irma and to Wayne was the discovery of the information regarding the relationship between David and his father.
>
> Q: What was the nature of that relationship?
>
> A: It was one of sexual contact between the two of them. I had had different meetings with Wayne. I had an individual meeting with Wayne, and individual meetings with Irma, a meeting with Wayne and Irma together and, of course, several meetings with David in which the three of them *requested that we not disclose that information.*

PCR Tr. at 96–97.

9. Foell contends that this information would have been excluded on the basis that it was more prejudicial than probative under Federal Rule of Evidence 403—while there is a slim possibility that the information would be excluded, there was an at least equal possibility that it would be admitted. It is impossible to predict, in hindsight, how the Iowa District Court would have ruled on such a motion in limine had one been filed. The record illustrates that Mr. Byrne did not think the information would be excluded based on its potential prejudice outweighing its probative value. PCR Tr. at 114. It was reasonable, under the circumstances, for Mr. Byrne to strategically conclude that the possibility of this information being released, and the attendant harm that its admission would have caused Foell's case, outweighed the risk of using the information in the reports and taking the chance that the information regarding Foell's sexual relationship with his father would be excluded under Rule 403.

Testimony of Mr. Byrne, PCR Tr. at 112 (emphasis added); *see State v. Rieflin,* 558 N.W.2d 149, (Iowa 1996) ("The statutory physician-patient privilege does not attach when a defendant gives notice of the defense of insanity or diminished responsibility.") (citing *State v. Rhomberg,* 516 N.W.2d 803, 808 (Iowa 1994) and *State v. Craney,* 347 N.W.2d 668, 672 (Iowa 1984)); *see also* IOWA CODE § 622.10 (abrogating the physician-patient privilege where the condition of the person is an element or factor of the defense); *State v. Jacobs,* 607 N.W.2d 679, 684 (Iowa 2000) ("The diminished responsibility defense is a common law doctrine that permits proof of a defendant's mental condition on the issue of the defendant's capacity to form a specific intent in those instances in which the State must prove a defendant's specific intent as an element of the crime charged.").

Foell contends that Judge Heaney's dissent in *King v. Kemna,* 266 F.3d 816 (8th Cir.2001), supports his position that Mr. Byrne was ineffective as he failed to assert a diminished responsibility defense because he was ignorant of the law, not due to a calculated strategic decision. In *King,* the majority of the court determined that though an expert's report did not specifically address the question of diminished responsibility, a competent criminal defense attorney would realize that the report ruled out a diminished responsibility defense and when evaluated under the deference accorded to strategic decisions, trial counsel's decision not to pursue a diminished responsibility defense did not breach an objective standard of reasonableness. *Id.* at 824–25. Judge Heaney, dissenting, argued that counsel's performance *was* deficient as it was a result of his erroneous view of the applicable law. *Id.* at 827 (Heaney, J., dissenting). Further, Judge Heaney found that counsel's testimony "plainly betray[ed] his ignorance of

the availability of the diminished capacity defense" and that "this ignorance [could] hardly be said to demonstrate 'such skill and knowledge as will render the trial a reliable adversarial process.'" *Id.* at 827 (Heaney, J., dissenting) (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). Foell points to Judge Heaney's dissent and asserts that there is nothing in the record that indicates that Mr. Byrne recognized the possibility of asserting a diminished responsibility defense, that Mr. Byrne's actions likewise reflect his ignorance of the difference between an insanity defense and a diminished responsibility defense, and finally that a reasonably competent attorney would have realized that Dr. Roberts's report and letter were devoid of any opinion regarding the plausibility of diminished responsibility. Pet. Obj. at 16–18. Petitioner is mistaken in asserting that the record is barren of any evidence showing that Mr. Byrne understood that a mental defense other than insanity (such as diminished responsibility) may have been available. In his testimony, Mr. Byrne clearly stated that he did not just consider FAS as a stand-alone defense, but would have considered FAS in combination with other factors as a defense if it were supported by the mental health reports:

A: Well, my analysis was more in terms of that my expert wouldn't accept it as a defense in this particular case. If [Dr. Roberts] had said, you know, in combination with these other factors I have observed in Mr. Foell, it's a viable defense, I would have gone with that. But, again, he's the expert and I'm not.

Q: Well, I guess what I'm trying to ask is whether you viewed Fetal Alcohol Syndrome as *something that could only be presented if it were an absolute defense, in other words, if it were to excuse the responsibility for commission*

*of the crime entirely like insanity,* let's say?

A: *No.*

PCR Tr. at 110–111. Mr. Byrne also testified that he had considered using FAS in conjunction with an intoxication defense, but ultimately it was ruled out both because Mr. Byrne felt it would not be successful and because of the Foell family's request that certain information in the mental health reports be kept private. PCR Tr. at 111. Further, this case is distinguishable from *King* in that here, Foell and his family specifically requested that certain information contained in the mental health reports not be released to the public. Clearly, Mr. Byrne conducted an investigation into Foell's mental health. The mental health evaluations revealed that Foell had no diminished capacity, generally, and also that he did not suffer from a mental disease. The Foell family, Foell included, all agreed that they did not want certain information in these reports revealed to the public. Mr. Byrne recognized that while Dr. Roberts's letter denounced a defense premised solely on FAS, it did not address the use of FAS as a partial defense. However, in light of Foell's insistence that certain information in the mental health reports not be revealed, and considering the substantial likelihood that such information would be revealed were a mental defense asserted, Mr. Byrne reasonably ceased inquiring into any mental defense, diminished responsibility included. This neither demonstrates an ignorance of the availability of a diminished responsibility defense, nor amounts to conduct falling below an objective standard of reasonableness. *Jones v. Delo,* 56 F.3d 878, 885 (8th Cir.1995) (find-

ing counsel not ineffective for not submitting insanity or diminished capacity defenses where defendant insisted that trial counsel not raise such defenses); *LaRette,* 44 F.3d at 685–86 (finding counsel not ineffective where counsel followed defendant's instructions not to present evidence of mental illness during the guilt phase of the trial). Based on the mental health reports, and the express wish that certain information in those reports not be disclosed, Mr. Byrne made a reasonable strategic decision not to assert a diminished responsibility defense and not to further research other mental defenses. Additionally, the reasonableness of Mr. Byrne's decisions is bolstered by the grave harm and prejudice that could have resulted if the information in the reports was available to the jury. There were statements in the reports that Foell participated in sex acts with his father for the purpose of obtaining money—this would have bolstered the State's contention that Foell committed the murder because he was promised monetary compensation by Oltman and Frank. Also, the State could have called any of the mental health professionals, Dr. Roberts in particular, to the stand to testify that Foell did not suffer from a mental disease, or even that if Foell had FAS it did not mitigate his responsibility in committing the murder. Further, there were statements in Dr. Roberts's report that could have refuted the proffered defense of a suggestible mental state coupled with intoxication [10]—which would have left Foell with no defense whatsoever. So, in addition to the fact that Mr. Byrne's decision not to pursue a mental defense in light of the express request of the family was reasonable, Foell has also failed to show that Mr. Byrne's actions in foregoing

---

10. Dr. Roberts's report states, in relevant part: "Mr. Foell is claiming that his associate on the night of the murder, Christopher Oltman, pressured him into the crime secondary to his drinking. *The cross-sectional presentation is not consistent with that.*" Plf.'s App. at 344.

a mental health defense prejudiced him in any way.

**■ ii. Untimely investigation.** Further, the court finds that Mr. Byrne's investigation into Foell's mental health was both reasonable and sufficiently timely. Mr. Anderson's and Dr. Roberts's reports were dated April 10, 1992, and April 14, 1992, respectively. Both of these reports detailed the sexual encounters Foell had with his father—information which the Foell family expressly requested not be available, despite the fact that they were informed that this decision precluded Foell from raising a mental defense. The notice of defenses was filed on April 14, 1992—the same day that Dr. Roberts' report was dated. After observing the damning statements in the reports concerning these sexual encounters, and in light of the Foell family request that this information not see the light of day, it was reasonable for Mr. Byrne to determine that no further investigation was necessary. Additionally, as to the specific objection that Mr. Byrne's investigation was untimely, the court finds that these reports were available to Mr. Byrne within a reasonable amount of time before trial for an informed discussion to take place on what defenses should be pursued.

**■ iii. Counsel unreasonably persuaded Foell to abandon a mental defense.** Next Foell contends that Mr. Byrne unreasonably persuaded him to abandon a viable mental defense of diminished responsibility by threatening to withdraw as counsel rather than present evidence of FAS—knowing that the Foell's family could not afford to hire a different attorney. Foell cites various provisions of the Iowa Code of Professional Responsibility that Mr. Byrne allegedly violated by threatening to withdraw as grounds for showing that he did not provide Foell with adequate representation. Foell's mother

did testify at the PCR hearing that in February or March of 1992, before the psychological evaluations were completed, Mr. Byrne told her he would withdraw as Foell's trial counsel if they continued to pressure him to present an FAS defense. PCR Tr. at 126–28. At the PCR trial, Mr. Byrne was never questioned, by either the State or Foell's appellate counsel, regarding this alleged threat to withdraw rather than present FAS evidence. Mr. Byrne did testify that he counseled all three Foell family members that their wish to preclude embarrassing information from being made public would eliminate any possibility for assertion of a mental defense:

Q: M-m h-m. All right. So it wasn't just a matter of foregoing the Fetal Alcohol Syndrome but anything that would have been brought up in any of the reports from the family and personal development center, it was a determination made that enough of those things, even if they were helpful to the defense, would not be brought up because it would be embarrassing to the family?

A: That was their request.

Q: Okay. That was a specific request that was made?

A: By all three.

Q: Okay. And it was your determination that you would honor that request even if it somehow compromised Mr. Foell's defense?

A: If I believed that [a mental defense] would have been successful, I would have advised them that we would have gone ahead with the defenses.

PCR Tr. at 112–13. The record does not support a finding that Mr. Byrne persuaded Foell to abandon a mental defense—rather, the record indicates that Foell was adamant that certain information not be made public, despite being advised by Mr. Byrne that this would preclude him from raising any mental defense. Furthermore,

Mr. Byrne's decision to counsel Foell not to raise a mental defense was a strategic decision based both on Foell's desires as well as on the likelihood of success that Mr. Byrne, in his professional judgment, felt a mental defense would have in this case. Even if Mr. Byrne made such a threat to withdraw [11] before the psychological testing was complete, it did not prejudice Mr. Byrne against researching the possibility of using FAS, procuring three evaluations by mental health professionals and asking Dr. Roberts specifically of the viability of presenting FAS as a defense. Even if Mr. Byrne made such a threat to withdraw, Foell cannot establish that it prejudiced the outcome of the trial—especially in light of the fact that Mr. Byrne went on to conduct a satisfactory and reasonable investigation into Foell's mental state and into the possibility of using FAS as a defense.

■ . *iv. Trial counsel presented no valid defense.* Finally, Foell contends that the defense chosen by Mr. Byrne—that Foell's intoxication coupled with his highly suggestible nature negated the specific intent required for a finding of first-degree murder—was not a defense a competent attorney would have asserted given the availability of a viable diminished responsibility defense. Foell argues that even if the information of Foell's sexual relationship with his father would have been admitted it could have been blunted by Foell's parent's testimony that Foell was not in dire need of money. Further, Foell asserts that the reports contain insurmountable benefits in that they support the contention that Foell was highly vulnerable to suggestion and undercut the prosecution's theory that it was a murder

for hire. Ultimately, Foell contends that Mr. Byrne's failure to present his only viable defense (diminished responsibility) constitutes a violation of Foell's right to effective assistance of counsel.

As the court has already discussed above, Mr. Byrne made a strategic decision based on his perceived likelihood of success of a mental defense in light of the damaging information regarding Foell's relationship with his father, as well as Foell's informed decision that this personal information not be made public despite the fact that it limited him as to what defenses he could pursue. Foell cannot seriously contend that asserting an intoxication defense was unreasonable—as Judge Zoss's Report and Recommendation pointed out there was evidence from a number of witnesses, Foell included, which could be interpreted to support such a defense. In addition to intoxication, Mr. Byrne also relied on Foell's enhanced suggestibility as support for the contention that Foell acted as Oltman's patsy on the night of the murder. In light of all the circumstances present at the time of the trial the court finds nothing that would call into question the reasonableness of the defenses asserted. Without admitting the mental health reports, Foell was left with only a few choices in terms of which defenses to assert. Mr. Byrne's assertion of a defense centered around Foell's manipulability coupled with intoxication was not outside the objective standard of reasonableness and certainly did not amount to, as Foell contends, the presentation of no defense whatsoever.

The record supports Judge Zoss's determination that Foell cannot demonstrate that he was prejudiced by any of these

---

11. The court need not, and does not, decide on this occasion whether the alleged threat to withdraw made by Mr. Byrne amounts to an ethical violation under the Iowa Code of Pro-

fessional Responsibility. That is a determination that will first be made, if at all, by the Iowa courts.

alleged shortcomings. Additionally, this court finds that Mr. Byrne's representation of Foell did not fall below an objective standard of reasonableness. Likewise, the Iowa courts' analysis of Foell's ineffective assistance of counsel claim did not represent an unreasonable application of the law in opposition to existing Supreme Court precedent.

### 3. Constructive denial of counsel

As what can only be described by this court as Foell's last gasp attempt to procure a writ of habeas corpus, Foell raises the argument that Mr. Byrne's strategic decisions amounted to a constructive denial of counsel as Mr. Byrne effectively failed "to subject the prosecution's case to meaningful adversarial testing," and therefore prejudice should be presumed. *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Foell draws on the Supreme Court's revisit of the *Cronic* decision in *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), for the proposition that prejudice is presumed where counsel is completely denied throughout the adversarial process, or if counsel is denied at critical stages of the proceedings. Pet. Obj. at 26. Further, Foell argues that his *Cronic* argument is not procedurally barred—the reason being that his constructive denial of counsel claim was presented to the Iowa courts in the form of his claim that trial counsel presented no valid defense on his behalf.

Magistrate Judge Zoss held that Foell's argument was procedurally defaulted as Foell never raised the issue of presumed prejudice under *Cronic* in the Iowa state courts, and further that even if the theory was not procedurally defaulted that Foell could not show that Mr. Byrne's defense strategy fit into the rare category of cases that justify the presumption of prejudice. Report and Recommendation

at 25–28. The court concurs with the conclusions reached by Judge Zoss.

### D. Certificate of Appealability

Foell must make a substantial showing of the denial of a constitutional right in order to be granted a certificate of appealability on these issues. *See Garrett v. United States,* 211 F.3d 1075, 1076–77 (8th Cir.2000); *Mills v. Norris,* 187 F.3d 881, 882 n. 1 (8th Cir.1999); *Carter v. Hopkins,* 151 F.3d 872, 873–74 (8th Cir.1998); *Ramsey v. Bowersox,* 149 F.3d 749 (8th Cir.1998); *Cox v. Norris,* 133 F.3d 565, 569 (8th Cir.1997), *cert. denied,* 525 U.S. 834, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox,* 133 F.3d at 569. Foell has failed to make such a substantial showing. Therefore, with respect to these claims, the court shall not grant a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(3).

### III. CONCLUSION

Foell's objections to Judge Zoss's Report and Recommendation with respect to the factual findings are granted in part and denied in part as delineated above. Further, as to the legal conclusions, the court **accepts** Judge Zoss's Report and Recommendation. Accordingly, Foell's petition for writ of habeas corpus is **denied.** A certificate of appealability will not issue as to these claims.

**IT IS SO ORDERED.**